UNITED STATES of America, Appellee,

v.

William JONES, Dwayne Frederick and Alson Schmidt, Defendants–Appellants.

Nos. 319, 679 and 680, Dockets 93–1334, 93–1350 and 93–1513.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1993.

Decided July 11, 1994.

Abraham L. Clott, New York City (Legal Aid Soc., Federal Defender Services Unit, of counsel), for defendant-appellant William Jones.

Paul J. McAllister, New York City, for defendant-appellant Dwayne Frederick.

Robert Koppelman, New York City, for defendant-appellant Alson Schmidt.

James E. Johnson, Asst. U.S. Atty., S.D.N.Y., New York City (Mary Jo White, U.S. Atty., Andrew C. McCarthy, Alexandra Rebay, Asst. U.S. Attys., of counsel), for appellee U.S.

Before NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

William Jones, Dwayne Frederick and Alson Schmidt appeal from judgments of conviction entered April 27, April 29 and June 23, 1993 respectively in the United States District Court for the Southern District of New York following jury trials held before Judge Louis L. Stanton. These three defendants were found guilty of operating a cocaine distribution ring in the South Bronx, New York. The legal issues they raise concern the sufficiency of the evidence, jury instructions, whether the Hobbs Act was violated, and the calculation of their sentences. The facts call attention, in addition, to the bravery of one police officer, something that should not be forgotten. This officer was one of a small band of those officers who at enormous personal risk go undercover to obtain the sort of evidence necessary to support a drug conviction in court. Here, an undercover New York City police officer having finally gained access to the drug ring headquarters was held at gunpoint, ordered to lie down, and then shot twice in the back. Although leaving him with serious permanent injuries, miraculously these wounds did not cost the officer his life. Because the facts on this appeal are somewhat complex we set them forth in some detail.

## BACKGROUND

### The Drug Ring

Defendant William Jones was the leader of a cocaine ring that he ran out of apartments located in tenements at 1975 Bathgate Avenue and 2115 Washington Avenue in the South Bronx. The initial contact that brought Jones' criminal activity to the attention of the police occurred during a May 15, 1989 undercover "buy and bust" narcotics operation by New York City police investigators. On that occasion an undercover police officer approached two of Jones' workers at a stairway near the fourth floor landing at 1975 Bathgate Avenue and said he wanted to buy some cocaine. While the undercover agent waited, defendant Jones, standing in the doorway of apartment 5D, handed one of the two men a tin foil packet later found to contain $40 worth of cocaine. After the sale, police officers entered the apartment, arrested Jones, seized over an ounce of cocaine, a triple beam scale, and $15,000 in cash. In his post-arrest statement, Jones admitted he was being supplied with up to one-half kilogram of cocaine per week. When released he continued conducting his narcotics operation.

While investigating Jones, Jerry Ortiz, the seriously wounded New York City police officer, encountered, among others, defendants Alson Schmidt, Dwayne Frederick and Dwayne's brother, Curtis Frederick. Posing as a dealer of drugs from Westchester County, New York, officer Ortiz commenced a series of ever larger cocaine buys during the summer of 1989 with the object of gaining evidence concerning the cocaine ring and its participants. The first purchase occurred on June 30, 1989 when Dwayne Frederick and another man sold him 15 vials of crack cocaine from the Bathgate Avenue address.

Next, on July 5 Allen Matthews, one of Jones' workers who later became a police informant, introduced agent Ortiz to Dwayne's brother, Curtis Frederick. Curtis and the undercover officer left 1975 Bathgate Avenue and walked to 2115 Washington Avenue to purchase cocaine. Curtis went into apartment 2F, which belonged to Jones, and there obtained one ounce of cocaine that he sold to officer Ortiz for $700. Ortiz did not meet directly with Jones because Jones did not yet trust him.

On July 14 the agent returned to Bathgate Avenue where he told Dwayne Frederick that he wanted to purchase more cocaine from either Jones or Dwayne's brother Curtis. The undercover agent was unable to make a purchase because as Curtis explained the person who supplied them had been

"busted." But, four days later, on July 18 Curtis Frederick introduced officer Ortiz to Jones in front of 1975 Bathgate Avenue. Jones then agreed to sell him one ounce of cocaine at 2115 Washington Avenue. After telling the undercover officer their cocaine business operated "24 hours, seven days a week," Curtis went to get the cocaine from Jones. Officer Ortiz asked Curtis if he could speak with Jones, but was told "no" because Jones was "busy and he ha[d] three other people up there and they're making bottles and he doesn't trust nobody," but that the next time he bought cocaine he would be permitted to "go straight upstairs."

Thus, on July 25 when agent Ortiz returned to 1975 Bathgate Avenue and met Jones in front of the building, they proceeded directly to 2115 Washington Avenue where Jones allowed officer Ortiz to enter apartment 2F and there sold him an ounce of cocaine for $700. Jones also agreed to sell him 125 grams (one-eighth kilogram) of cocaine on August 3 for $2,500.

On August 3 undercover surveillance officers observed Jones enter 1975 Bathgate Avenue accompanied by a Hispanic male who had arrived in a white Audi. This person had been observed entering the same address on July 14 and apparently was one of Jones' cocaine suppliers. When agent Ortiz arrived Jones escorted him to apartment 2D where he made the $2,500 buy. Jones then said that on August 10 he would sell him a half-kilo of cocaine for between $8,000 and $9,000.

### The Robbery

Between August 3 and August 10 Jones, Curtis Frederick and Schmidt began to formulate a plan to rob agent Ortiz when he returned to make the half-kilo purchase. Dwayne Frederick and another person stored a duffle bag containing a .38 caliber silver-plated handgun in an apartment next to apartment 2D at Bathgate Avenue. On the morning of August 10 Schmidt brought the silver-plated gun into apartment 2D. Later, when undercover officer Ortiz arrived, Curtis arranged for Schmidt and Dwayne to join him. After Curtis escorted the officer up to apartment 2D, Schmidt entered the

apartment and ordered the officer to "lay down" and told him that if he moved, he was dead. Agent Ortiz pleaded with Schmidt, but to no avail. After pulling the trigger of the .38 twice before finally reaching a loaded chamber, Schmidt fired three shots, striking the undercover agent twice in the back causing massive internal injuries. Because officer Ortiz was carrying a transmitter, surveillance police officers heard the shots and forced their way into the apartment where they arrested defendants Schmidt and Curtis Frederick, and summoned medical help for the wounded officer. Defendants Dwayne Frederick and Jones were arrested later. Schmidt's fingerprints were identified on the silver-plated .38 found at the scene of the crime, and it was established that this was the gun used to shoot officer Ortiz.

### PRIOR PROCEEDINGS

As a result of their involvement in these crimes, William Jones, Dwayne Frederick, Alson Schmidt and Curtis Frederick were indicted and charged with conspiring to violate the narcotics laws of the United States, 21 U.S.C. §§ 812, 841 and 846 (1988). Dwayne Frederick and Schmidt were also charged with conspiracy to commit robbery in violation of 18 U.S.C. § 1951 (1988) (Hobbs Act), and with robbery and attempted robbery affecting interstate commerce in violation of 18 U.S.C. §§ 1951 and 2, and possession and use of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c) and 2 (1988).

All of the defendants had previously been prosecuted by the State of New York in Bronx County for different offenses arising out of the conduct charged in the federal indictment. Jones had previously been convicted of criminal possession of cocaine (on May 15, 1989), and acquitted in a separate case for distributing cocaine on three occasions (July 18, July 25, and August 3, 1989) to officer Ortiz. Schmidt had been acquitted of attempting to murder officer Ortiz. Dwayne Frederick had been convicted for a June 30, 1989 sale of crack to officer Ortiz. Curtis Frederick had entered guilty pleas on charges of attempting to murder officer Ortiz and selling cocaine to him on several occa-

sions. The four defendants also had been previously tried in the United States District Court for the Southern District of New York (Knapp, J.) on an earlier indictment arising out of the same conduct. The trial before Judge Knapp ended in a mistrial when after nine days of deliberations the jury deadlocked. The case was subsequently reassigned to Judge Stanton before whom the judgments of convictions presently before us on appeal were obtained.

Defendant Jones, whose trial was severed from defendants Dwayne Frederick and Schmidt, was convicted of conspiracy to violate the narcotics laws of the United States in violation of 21 U.S.C. § 846 and sentenced to 28 years imprisonment, five years supervised release and a special assessment of $50. Dwayne Frederick was convicted of conspiring to violate the narcotics laws in violation of 18 U.S.C. §§ 841 and 846 and sentenced to 121 months imprisonment, five years supervised release and a special assessment of $50. Alson Schmidt was convicted of the same conspiracy violations and was also convicted of being a member of a conspiracy to commit robbery in violation of 18 U.S.C. § 1951, and for the crimes of robbery and attempted robbery affecting interstate commerce in violation of 18 U.S.C. §§ 1951 and 2, a violation of the Hobbs Act, and with possession and use of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c) and 2. He was sentenced to 28 years imprisonment, three years supervised release and a special assessment of $200. These three defendants, Jones, Dwayne Frederick and Schmidt are appellants on this appeal. Curtis Frederick, who has not appealed, pled guilty as he had in state court to all counts charged in the indictment, except conspiracy to violate the narcotics laws of the United States, and was sentenced to 15 years imprisonment.

## DISCUSSION

Jones appeals only from the imposition of his sentence. The sole issue raised on Dwayne Frederick's appeal is whether it was error for the trial judge to decline to charge the jury on the elements of distribution on the conspiracy count. Schmidt appeals the sufficiency of the evidence connecting him to the narcotics conspiracy and establishing the interstate commerce nexus in the robbery of officer Ortiz; he also appeals from the sentence he received and, along with Dwayne Frederick, challenges the jury charge respecting the substantive elements of distribution and possession of narcotics.

We discuss first whether the evidence at trial sufficiently established that Schmidt was a member of the narcotics conspiracy; second, whether jury instructions appropriately spelled out the elements of the narcotics conspiracy count; third, whether the government produced enough evidence to prove an interstate commerce nexus to support the conviction for the robbery of officer Ortiz under the Hobbs Act; and, fourth, Jones' and Schmidt's sentences.

### I Sufficiency of the Evidence

Schmidt contends that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that he was a member of the narcotics conspiracy charged in the indictment. Mounting a sufficiency of the evidence challenge is always an uphill battle for a convicted defendant. *See United States v. Scarpa,* 913 F.2d 993, 1003 (2d Cir.1990). The principal reason for this is because in examining the merits of such a contention, an appellate court views the evidence in the light most favorable to the prosecution. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942). We of course must uphold the jury verdict if "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

■■■■ Because a conspiracy, as the very import of the word suggests, is a clandestine affair whose participants intend to keep it secret, its elements may be established through circumstantial evidence. *See United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). And, once a conspiracy between two or more defendants is found to exist, though the link between another defendant and the conspiracy need not be strong, the evidence must suffice to

permit the jury reasonably to find the element of that defendant's participation—like every element—proven beyond a reasonable doubt. *See United States v. Clavis,* 977 F.2d 538, 539 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); *United States v. Durrive,* 902 F.2d 1221, 1228–29 (7th Cir.1990); *United States v. Coleman,* 811 F.2d 804, 807–08 (3d Cir. 1987); *United States v. Marsh,* 747 F.2d 7, 13 (1st Cir.1984). Yet, a defendant who is simply present at the scene of a crime or who knew only of the existence and goals of a narcotics conspiracy is not thereby guilty of being a conspirator; the government must prove more than that. *See United States v. Torres,* 901 F.2d 205, 220 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). It must show the defendant knowingly joined and participated in the objectives of the conspiracy. *See United States v. Soto,* 716 F.2d 989, 991 (2d Cir. 1983). Although an express agreement to participate in the conspiracy is not needed, the proof must demonstrate at least a tacit understanding between the parties to further the violation of the law. *See United States v. Rivera,* 971 F.2d 876, 890–91 (2d Cir.1992); *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988).

■ Schmidt does not contend the government failed to prove the existence of the drug conspiracy. Instead, he asserts the proof at trial established only that he was associated with William Jones and Curtis Frederick and that he knew they were involved in selling drugs at 1975 Bathgate Avenue. He maintains that even if he knew that on July 14 officer Ortiz was seeking out Curtis Frederick for the purpose of purchasing cocaine, his actions amounted to no more than his having pointed out to a willing buyer how to contact a willing seller, and not evidence that he had agreed with the seller to facilitate the drug transaction.

The government proved its case against appellants at trial through the testimony of officer Ortiz, through producing narcotics and narcotics paraphernalia seized from the Bathgate Avenue and Washington Avenue apartments, and through video and audio tape recordings of meetings between these defendants and other members of the cocaine ring. The government also introduced evidence of the events of August 10, which included the production of the silver-plated .38 handgun found at the scene of the shooting of officer Ortiz, and Schmidt's post-arrest statements. The defense offered no proof.

With respect to appellant Schmidt specifically, the prosecutor produced evidence that placed him at the scene of a July 14 meeting between agent Ortiz and Dwayne Frederick in front of 1975 Bathgate Avenue. At this meeting the undercover officer told Dwayne Frederick that he was looking for either Jones or Curtis Frederick, from whom he had previously bought cocaine, and that he wanted to purchase more. Dwayne Frederick told officer Ortiz to return to the building later that day. When the officer returned to 1975 Bathgate Avenue, he approached Schmidt and asked whether either of the other two were around. Schmidt told him they would be right back and instructed him to wait. When Curtis Frederick arrived, Schmidt immediately ran over to his car.

The jury was reasonably entitled to infer from the just recited evidence that Schmidt was an interested observer at the first meeting between Curtis and officer Ortiz, was aware of the prior arrangements the undercover agent had made with Curtis, and was in front at 1975 Bathgate awaiting officer Ortiz' return. That is to say, Schmidt was in fact facilitating communication between Curtis Frederick and officer Ortiz with the intent of having the narcotics transaction consummated.

Evidence of Schmidt's participation in the narcotics conspiracy was not limited to his actions on July 14. Proof at trial showed apartment 2D at the Bathgate Avenue address was carefully guarded by Jones, and that access to it was limited to trusted associates and reliable customers. For example, undercover officer Ortiz, who was attempting slowly to kindle the conspirators' confidence in him, was not invited into the apartment until after he had made three cocaine purchases. By contrast, Schmidt admitted in his post-arrest statement that he had unrestricted access to the apartment. From this, as well as from Schmidt's own statement that

he, Jones and Curtis Frederick had discussed robbing officer Ortiz, the jury could properly infer that only a trusted member of Jones' organization would be permitted to join the planning of such a crime.

Viewing the evidence most favorably to the prosecution, a rational juror could find beyond a reasonable doubt that Schmidt was more than a disinterested person helping a willing buyer locate a willing seller. As the jury concluded, he was a trusted member of the Jones narcotics conspiracy, actively participating in its operations and intending it to succeed for his own benefit. As a consequence, appellant Schmidt's attack on the sufficiency of the evidence convicting him of conspiracy to violate federal narcotics laws does not successfully carry the heavy burden imposed on him.

## II The Drug Conspiracy Jury Instructions

Schmidt and Dwayne Frederick contend the district court erred by not charging that the *"objectives* of the conspiracy, distribution and possession of drugs with the intent to distribute, were to be carried out 'unlawfully, intentionally and knowingly.'" Frederick joins Schmidt's argument under Fed. R.App.P. 28(i) and asserts, in addition, that the district court should have instructed on the definitions of the words possess and distribute.

■ When a defendant raises as an issue on appeal a requested charge that was not given, he must demonstrate that the charge requested accurately stated the law and that the trial court's failure to give the charge prejudiced him. *See United States v. Dove,* 916 F.2d 41, 45 (2d Cir.1990). Whether a jury was properly instructed is a matter for *de novo* review. To assess how a reasonable juror could interpret an instruction, we focus first on the specific language of the given instruction, and then, if that instruction is deficient, examine the entire charge to see if the instructions as a whole correctly comported with the law. *See California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987).

■ When it summarized the indictment laid against appellants, the district court instructed the jury that the first count involved the federal narcotics laws, explaining that it is illegal to possess or distribute cocaine and cocaine base and that appellants had been charged with unlawfully, intentionally and knowingly conspiring to distribute and possess with intent to distribute narcotics. It went on to instruct on conspiracy, stating that a conspiracy is an "agreement of two or more persons to join together to accomplish some unlawful purpose," and that in order to convict defendants on this charge, the jury had to find "beyond a reasonable doubt that each defendant knowingly and intentionally became a participant in or a member of the conspiracy." The district court judge added that the defendant "must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends." It defined the term "knowingly" and "intentionally" in some detail.

Defendants insist that because there was no specific instruction that knowledge and intent were also required for them to be found guilty of the substantive crimes of possession and distribution, the jury would not necessarily have known that the prosecution had to prove these specific states of mind before defendants could be convicted of the substantive crimes. Schmidt objected to the instruction after it had been delivered, requesting the trial court to clarify its instructions regarding the state of mind required as to possession and distribution. The district court declined this request.

■ Where a defendant is convicted of conspiracy to violate the law, the conviction will not be upheld on appeal unless it has been established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute. *See Soto,* 716 F.2d at 993. To affirm defendants' convictions, the jury must have known what state of mind was required to violate the substantive crimes of distribution and possession with intent to distribute narcotics, 21 U.S.C. § 841.

Because defendants tell us the instruction as given omitted a necessary element—although they did not suggest substitute lan-

guage—we look at the charge as a whole to see if it correctly stated the law. *See Brown,* 479 U.S. at 541, 107 S.Ct. at 839. Having carefully read the charge as delivered, we conclude not only that the charge adequately reflected the law, but that it also would have conveyed to a reasonable juror the state of mind requirement—that the defendants must have intended to conspire knowingly and intentionally to violate the substantive narcotics laws of the United States as proscribed by § 841. Because the charge as given was substantially correct, defendants cannot show prejudice. *See Dove,* 916 F.2d at 45.

Further, the jury was given a copy of the indictment to take with it during its deliberations. The indictment clearly stated that the defendants had to unlawfully, intentionally and knowingly conspire to violate federal narcotics laws. Under "Objects of the Conspiracy," the indictment continued by setting forth the requirement that defendants must have "unlawfully, intentionally and knowingly" distributed and possessed with intent to distribute cocaine and cocaine base in violation of §§ 812 and 841. Although we believe the district court had already done so, the indictment itself certainly informed the jury what state of mind was required to violate the substantive narcotics offenses. From this, the jury knew what state of mind the defendants must have had to conspire to distribute and possess with intent to distribute cocaine and cocaine base. *See United States v. Montiell,* 526 F.2d 1008, 1011 (2d Cir.1975) (holding defendant was not prejudiced where the district court made a minor error in charging the jury, since the court had read the indictment to the jury and the indictment contained the proper elements of the charge). Moreover, Frederick's contention that the trial court did not define "possess" and "distribute" in its charge is without merit because these common words are self-explanatory. *See id.* In sum, we find no error in the district court's charge.

### III Violation of the Hobbs Act, 18 U.S.C. § 1951

 Schmidt also maintains the government failed to produce evidence sufficient to prove that the funds stolen from agent Ortiz, with which he intended to purchase cocaine, could supply the necessary nexus to interstate commerce required to prove a Hobbs Act violation. He insists there is no direct link between the robbery of cash from officer Ortiz and interstate commerce; and, any indirect link, such as a depletion-of-assets theory, appellant goes on, was specifically rejected by the trial court as a basis for satisfying the commerce requirement because it was sheer speculation.

The Hobbs Act insofar as here pertinent states:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,-000 or imprisoned not more than twenty years, or both.

> (b) As used in this section—

> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence....

> . . . . .

> (3) The term "commerce" means ... commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

In *United States v. Augello,* 451 F.2d 1167 (2d Cir.1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972), we acknowledged Congress' broad power under the Commerce Clause, and its specific authority as evidenced by the Hobbs Act in criminal cases implicating interstate commerce. Sufficient proof to support a violation of the Act has been presented if the robbery of officer Ortiz "in any way or de-

gree," affects commerce, even though the effect is not immediate or direct or significant, but instead is postponed, indirect and slight. *See id.* 1169–70; *see also Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence."); *Brooks v. United States,* 267 U.S. 432, 436, 45 S.Ct. 345, 345–46, 69 L.Ed. 699 (1925) ("Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other States from the State of origin.").

■ The Hobbs Act has been construed as prohibiting the illegal interference in any manner whatever with interstate commerce, even when the effect of such interference or attempted interference is minimal. *See Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991). In a prosecution for a conspiracy to commit a Hobbs Act violation, all that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect. *See United States v. Curcio,* 759 F.2d 237, 242 (2d Cir.), *cert. denied,* 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 117 (1985); *see also United States v. Jannotti,* 673 F.2d 578, 592 (3d Cir.) (en banc) (holding that convictions for conspiracy and attempt to violate the Hobbs Act have been sustained even without evidence of an actual effect on interstate commerce), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

We quickly dispose of Schmidt's suggestion that the government sought to create Hobbs Act jurisdiction through its "buy and bust" operation, and that any potential effect on interstate commerce was one the government contrived. In *United States v. Gambino,* 566 F.2d 414 (2d Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978), we ruled that an effect on interstate commerce was proved because although the FBI had established its own corporation, it had at the same time entered into an actual agreement to provide sanitation service to a

service station. *Id.* at 417–18. Because the activities of the FBI corporation were "necessarily wedded to interstate commerce," *id.* at 419, it made no difference that the corporation was set up by the FBI.

The present case is similar to *Gambino* in that here New York City Police set up a buy and bust operation aimed at purchasing cocaine, a commodity that travels in interstate commerce. The robbery of $9,000 from agent Ortiz affected interstate commerce because the loss of those funds limited the amount of cocaine he would have been able to purchase in the future. The result is the same whether officer Ortiz was a government agent or a private individual known to be engaged in narcotics trafficking; in either case, such person's assets were depleted, thus affecting his ability to purchase a commodity that travels in interstate commerce.

This theory of liability, resting on an indirect effect on interstate commerce, can be styled as a depletion-of-assets theory. *See United States v. Daley,* 564 F.2d 645, 649 (2d Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *Augello,* 451 F.2d at 1170. Contrary to Schmidt's assertion, the district court did not reject this theory as a basis for satisfying the interstate commerce requirement of the Hobbs Act. Instead, it accepted this approach as a particularly astute application by the government, and accordingly charged the jury that it could not find the defendants guilty of a Hobbs Act violation if all it found was an intent to steal money from officer Ortiz. It was also necessary, the judge continued, that the jury find interstate commerce was affected by the defendants' actions. With respect to the effect on interstate commerce, the district court charged that cocaine came from outside of New York and would qualify as moving in interstate commerce. Hence, it is clear the jury was charged that under the depletion-of-assets theory it *could* find the defendants guilty of a Hobbs Act violation if the requisite elements were found beyond a reasonable doubt.

■ Schmidt next avers that a violation of the Hobbs Act could not be found in this case because the commodity that traveled in interstate commerce is illegal under federal

law. This argument is wholly unpersuasive; the reach of the Hobbs Act is coextensive with that of the Commerce Clause. *See Stirone*, 361 U.S. at 215, 80 S.Ct. at 272; *United States v. Staszcuk*, 517 F.2d 53, 58–9 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (holding that the Hobbs Act should be construed expansively). We agree with the view expressed by the Seventh Circuit in *United States v. Ambrose*, 740 F.2d 505 (7th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), that it is "unrealistic to suppose that all Congress cared about in passing the Hobbs Act was promoting trade among the states; common sense, with a little support in legislative history, suggests that interstate commerce was not merely the object of Congress's solicitude but also a handle for enabling federal power to be brought to bear on criminal activities that, because of their multistate incidence, the states had difficulty controlling." *Id.* at 512 (citing 91 Cong.Rec. 11909–10 (1945) (remarks of Chairman of House Judiciary Committee)); *cf.* H.R.Rep. No. 1833, 73d Cong., 2d Sess. 2 (1934) (letter from Attorney General concerning bill that became the Anti-Racketeering Act, the predecessor to the Hobbs Act).

It is of no moment therefore that the commodity traveling in interstate commerce is illegal under federal law. *See United States v. Hanigan*, 681 F.2d 1127, 1131 (9th Cir.1982) (holding within the reach of the Hobbs Act "the movement of undocumented alien laborers across a national boundary into this country"), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983). Appellant Schmidt relies on *United States v. Blakey*, 607 F.2d 779 (7th Cir.1979) and *Ambrose*, 740 F.2d 505, for the proposition that in order to come within the purview of the Hobbs Act, the business venture, if it is of an illegal nature, must also have in it an element of a legal nature. But the Hobbs Act is not confined either by its language or its legislative history to require some effect on goods traveling legally in interstate commerce. *See Ambrose*, 740 F.2d at 512. Schmidt's conviction under counts two and three of the indictment for conspiring to violate and for violat-

ing the Hobbs Act, 18 U.S.C. § 1951, must therefore be affirmed.

## IV Sentencing

Defendants Jones and Schmidt both challenge their sentences. Jones argues that the district court erred when it found the cocaine conspiracy he operated was in existence from at least January 1989 through August 10, 1989, and that during its duration he distributed at least 15 kilograms of cocaine. Schmidt challenges the finding that in January 1989 he entered the narcotics conspiracy and conspired to distribute more than 15 kilograms of cocaine, and further urges it was error for the sentencing court to depart upwardly when it sentenced him. The district court used the 1989 Sentencing Guidelines to sentence both defendants, and citations herein are to those Guidelines.

### A. Jones' Sentence

The base offense level for conspiracy to possess or distribute narcotics in violation of § 846 hinges on the amount of narcotics involved. *See* U.S.S.G. § 2D1.4 (1988); § 2D1.1(a)(3) (1987). While the burden rests on the government to prove the quantity of drugs possessed or distributed by a preponderance of the evidence, *see United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993), fixing the amount of drugs is within the province of the sentencing court. *See United States v. Olvera*, 954 F.2d 788, 791 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992). In deciding quantity involved, any appropriate evidence may be considered, *see United States v. Madkour*, 930 F.2d 234, 237 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 308, 116 L.Ed.2d 251 (1991), or, in other words, a sentencing court may rely on any information it knows about. *See United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). A sentencing court's calculation of quantity in a drug conspiracy will be upheld unless clearly erroneous. *See United States v. Davis*, 967 F.2d 84, 88 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992).

■ Under Sentencing Guideline § 2D1.1(a)(3), the district court ruled that Jones' narcotics trafficking activity corresponded to a base offense level of 34 because at least 15 kilograms of cocaine were involved. Two levels were added for possession of firearms and four for Jones' supervision of five or more participants in the conspiracy, bringing the base offense level to 40, which yielded a sentencing range of 292 to 365 months. Jones was sentenced to 28 years (336 months), near the upper limit of this range.

The point of contention is the finding that the Jones narcotics conspiracy involved at least 15 kilograms of cocaine. Had the district court found an amount less than 15 kilograms of cocaine, Jones' base offense level would have been 32, *see* U.S.S.G. § 2D1.1(a)(3), to which would have been added the recited six level upward adjustments, making a base offense level of 38. In such case the sentencing range would have been between 235 and 293 months (from about 20 to 24 years), thus precluding the 336 months (or 28 years) Jones actually received.

At the sentencing hearing, the district court was particular in its explanation of the evidence that would be taken into account in Jones' sentence. It stated that although Jones had been implicated in one narcotics transaction involving crack cocaine, his primary involvement was in a cocaine conspiracy, and therefore the court's findings of fact would be predicated on cocaine distribution. The factors the district court stated it would rely on in sentencing Jones were the indictment, the evidence submitted at his trial, and the evidence admitted at the trials of Jones' co-conspirators, Dwayne Frederick and Alson Schmidt. Judge Stanton took special pains to point out that he would not consider "evidence culled from other proceedings with dubious outcomes, and particularly in the government's case, resting on a witness of very questionable reliability, Mr. Matthews."

The sentencing court believed the most reliable basis for calculating the amount of cocaine distributed by the conspiracy was Jones' own statements following his May 15 arrest when he admitted "they were processing between a quarter and a half a kilo per week." From this admission, the district court made a conservative assumption that the conspiracy commenced in early 1989 and had distributed at least 15 kilograms of cocaine before it terminated on August 10, 1989. While this conclusion seems on its face logical enough, it is this factual finding regarding the quantity of narcotics distributed that Jones declares is clearly erroneous. He asserts there is no evidence to support it.

■ To the contrary, there is considerable evidence to support the assumption that the Jones conspiracy began distributing cocaine at the beginning of 1989. Although specific narcotics transactions prior to May 15, 1989 were not set forth in the indictment, that instrument does charge illegal narcotics trafficking beginning in January 1989 and the evidence shows this was a large-scale ongoing cocaine distribution ring. Jones' May 15, 1989 post-arrest statement admitted he was being supplied with up to a half-kilo of cocaine a week. His admission may properly be used as a factor in determining his sentence. *See Olvera,* 954 F.2d at 791. Allen Matthews, a member of Jones' ring who had become a government informant, testified at defendant's first trial before Judge Knapp that Jones had been selling cocaine since at least 1986. Had Judge Stanton relied on this testimony, a base offense level of 36 driven by a finding of the distribution of 50 kilos of cocaine could easily have been arrived at with its attendant virtual life sentence. *See* U.S.S.G. § 2D1.1(a)(3). But the sentencing court did not rely on Matthews' testimony.

Instead, ample evidence supports an inference of an active narcotics conspiracy dating back at least several months before the ring's criminal activities came to the attention of the police in May 1989. At that time there was a sizeable group of operatives (more than five) involved in the distribution of cocaine, and two different South Bronx apartments—one at Washington Avenue and the other at Bathgate Avenue—were utilized in the distribution scheme. In addition, wholesale quantity suppliers were already in place and servicing the Jones group, which was, according to what Curtis Frederick told agent Ortiz, operating 24 hours, seven days a

week. Perhaps most significant, the Guideline commentary suggests that when there is no drug seizure that can serve as the basis for fixing the quantity for sentencing purposes, or the amount seized does not accurately reflect the scale of the offense, as is the case here, the sentencing court "shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.4, commentary (n. 2); § 2D1.1, commentary (n. 11).

We must conclude therefore that when performing its calculation, the district court could reasonably draw an inference of a long-standing drug distribution ring, one that had been in operation for a number of months, not just for a few weeks. Consequently, its estimate of the amount of cocaine the conspiracy distributed between January and August 1989—a period of over 30 weeks, resulting in a finding that the Jones narcotics conspiracy handled at least 15 kilograms of cocaine—is not clearly erroneous.

## B. *Schmidt's Sentencing*

In the calculation of Schmidt's sentence the same findings with respect to the 1989 commencement of the conspiracy and the 15 kilograms distributed were made. In accordance with Sentencing Guideline § 2D1.1(a)(3), his base offense level was 34 with a sentencing range of from 151 to 188 months (about 12½ to 15½ years). The district court then departed from the Sentencing Guidelines pursuant to § 5K2.2 (1987), which states that a substantial upward departure may be appropriate "[w]hen the victim suffers a major, permanent disability and when such injury was intentionally inflicted." U.S.S.G. § 5K2.2, p.s.

In determining the appropriate level of departure, the sentencing judge thought § 2D1.1(a)(2) analogous. This provision punishes drug offenses at base offense level 38 when death or serious injury results from use of the substance. *See* U.S.S.G. § 2D1.1(a)(2). In effect, the district court departed upward four levels to base offense level 38 with a corresponding sentencing range of from 235 to 293 months (about 18 to 24½ years). Schmidt was sentenced to 23 years or 276 months after the district court credited the fact that Schmidt had already spent one year in custody in connection with the instant offense. The district court reasoned—alternatively, and independently of its finding that the harm categorized by Sentencing Guideline § 2D1.1(a)(2) was analogous to the harm caused in the case at hand—that an upward departure to base offense level 38 was warranted "to give recognition to the cold ferocity of the shooting which was planned for days and which demonstrates the character of the defendant in a way which independently justifies an upward departure."

In addition to the 23 years imposed on count one, Schmidt was sentenced to 20 years on each of the Hobbs Act violations to run concurrently with each other and with the sentence imposed under count one. A mandatory five year sentence was added to run consecutively to the above mentioned sentences for violation of 18 U.S.C. § 924. Thus, Schmidt was sentenced to a total of 28 years imprisonment for his participation in the offenses for which he was convicted.

■ As to the base offense level, the trial evidence demonstrated Schmidt had unrestricted access to the Bathgate Avenue apartment. Undercover officer Ortiz, on the other hand, was not allowed access to the apartment until after he had made three purchases from the conspirators. Schmidt admitted he was involved in the planning of the Ortiz robbery, further demonstrating his trusted position in the conspiracy. Based on this, it was not clearly erroneous for the district court to conclude that Schmidt had been a trusted member of the conspiracy since at least January 1989 and thus should be held responsible for the 15 kilograms of cocaine properly attributable to the conspiracy.

■ Schmidt contends in addition that the district court misapplied the Sentencing Guidelines by departing upwardly from Sentencing Guideline § 2D1.1(a)(3) instead of grouping the narcotics conspiracy conviction and the robbery conviction and then considering first the adjustments under Robbery Guideline § 2B3.1 (1988). Section 2B3.1(b)(3)(C) provides for a six-level increase for permanent or life-threatening bod-

ily injury occurring in the course of a robbery and Application Note 7 to that Guideline refers to Guideline § 2A2.1 (1987), Assault with Intent to Commit Murder.

It was unnecessary to group the narcotics conspiracy conviction with the robbery conviction. These acts were not closely-related counts, as contemplated by § 3D1.2 (1987). Schmidt was a member of two separate conspiracies—the narcotics conspiracy and the conspiracy to commit robbery. *See United States v. Odofin,* 929 F.2d 56, 61 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 154, 116 L.Ed.2d 120 (1991). Further, although §§ 2B3.1 and 2A2.1 give consideration to the extent of officer Ortiz' injuries, neither explicitly considers that the intentional injuries occurred within this particular context or the stark fact of Schmidt's indifference in inflicting these injuries upon the undercover officer. We therefore hold that Judge Stanton had the authority to depart upwardly under § 2D1.1 because the Sentencing Guidelines do not adequately take into consideration this aggravating intentional factor or Schmidt's behavior in this instance at least not "to [the] degree," 18 U.S.C. § 3553(b) (1988), that this factor is present in this case. *See United States v. Merritt,* 988 F.2d 1298, 1306–07 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); *United States v. Kim,* 896 F.2d 678, 685 (2d Cir.1990).

## CONCLUSION

Accordingly, for the reasons stated the judgments of convictions of defendants Jones, Frederick and Schmidt are affirmed.