**UNITED STATES of America**

v.

**Samuel D. SAGE.**

**No. 3:95cr108 (DJS).**

United States District Court,
D. Connecticut.

Oct. 3, 1995.

Terence S. Ward, Federal Public Defender's Office, Hartford, CT, for Samuel D. Sage.

Christopher F. Droney, Denise Derby, John H. Durham, U.S. Attorney's Office, New Haven, CT, for U.S.

*MEMORANDUM OPINION
AND ORDER*

SQUATRITO, District Judge.

This matter is now before the court on Defendant Samuel D. Sage's ("Sage") August 14, 1995 motion to dismiss the information filed against him for an alleged violation of the Child Support Recovery Act of 1992 ("CSRA"), 18 U.S.C. § 228. The Defendant claims three bases for dismissal: (1) the CSRA is an unconstitutional exercise of the commerce power under Article I § 8, U.S. Constitution; (2) the CSRA violates the Tenth Amendment and offends principles of federalism and comity; and (3) the CSRA is void for vagueness.

## I. BACKGROUND

On July 13, 1995 the government filed a one-count information charging the Defendant with willful failure to pay child support as previously ordered by the Superior Court of the State of Connecticut. The information states that "[f]rom on or about September 23, 1991, through the date of this information, in the District of Connecticut and elsewhere, the defendant, SAMUEL D. SAGE, who resides in a different state, willfully and unlawfully failed to pay legal child support obligations as ordered by the Superior Court for the State of Connecticut, for his two minor children ... which amount is in excess of $5,000,00." This district issued a warrant for the Defendant's arrest, which was effected in Ohio.

For the reasons stated below, Sage's motion to dismiss is denied.

1. The Child Support Recovery Act of 1992 states as follows:

Failure to pay legal child support obligations
(a) Offense.—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).

(b) Punishment.—The punishment for an offense under this section is—

## II. DISCUSSION

### A. PRESUMPTION OF CONSTITUTIONALITY

■ In determining the validity of a statute, the court must presume constitutionality. *See Walters v. National Ass'n of Radiation Survivors,* 468 U.S. 1323, 105 S.Ct. 11, 82 L.Ed.2d 908 (1984); *see also United States v. National Dairy Products Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). In areas of social and economic policy, it is not for the courts to judge the propriety of the Legislature's decisions.

> "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."

*FCC v. Beach Communications, Inc.,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979)). This principle applies even if such decisions may broaden the federal government's role. *See New York v. United States,* 505 U.S. 144, 157, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992). "That Congress' predictive judgments are entitled to substantial deference does not mean, however, that they are insulated from meaningful judicial review altogether." *Turner Broadcasting Sys. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994).

### B. THE COMMERCE CLAUSE

The Defendant relies on the recent U.S. Supreme Court decision, *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), for his contention that the CSRA[1] is unconstitutional.

(1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and

(2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.

(c) Restitution.—Upon a conviction under this section, the court shall order restitution under section 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing.

In *Lopez* the Defendant possessed a handgun on the grounds of a Texas high school. Following his arrest, the Defendant was charged with and convicted of violating the Gun–Free School Zones Act of 1990, which prohibits the possession of a firearm "at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). On appeal the Defendant challenged his conviction on the grounds that Congress had exceeded its authority under the Commerce Clause in enacting the statute. The Fifth Circuit agreed and reversed his conviction. *United States v. Lopez*, 2 F.3d 1342 (5th Cir.1993). The Supreme Court affirmed.

Much of the *Lopez* opinion is devoted to a review of the history of the Commerce Clause and its operation as a restraint on legislative authority. The Supreme Court reaffirmed the long-recognized proposition that

> The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce.

*United States v. Darby*, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941). The Court, however, also echoed the warning that

> the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliter-

ate the distinction between what is national and what is local and create a completely centralized government."

*Lopez*, —— U.S. at ——–——, 115 S.Ct. at 1628–29 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). Given the important interests at stake in the outcome of the analysis of any given reach of congressional authority, the Court noted its traditional duty to "undertake[ ] to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629 (citing cases).

▪ The Court also affirmed the existence of three broad categories of activity that Congress could regulate under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) activities which have "a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Id.* at ——–——, 115 S.Ct. at 1629–30 (citations omitted).

Turning to the statute at issue the Court found that Congress' power to enact 922(q) had to be found under Category Three. *Id.* at ——, 115 S.Ct. at 1629. Reviewing the statute under that category, the Court held that the law did not regulate an activity that substantially affected interstate commerce. Specifically, the Court observed: (1) 922(q) "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms," *id.* at ——–——, 115 S.Ct. at 1630–31;[2] (2) Congress had failed to make find-

(d) Definitions.—As used in this section—
(1) the term "past due support obligation" means any amount—
(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and
(B) that has remained unpaid for a period longer than one year, or is greater than $5,000; and

(2) the term "State" includes the District of Columbia, and any other possession or territory of the United States.
18 U.S.C. § 228.

**2.** The Court held that "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at ——, 115 S.Ct. at 1634.

ings on § 922(q)'s effects on interstate commerce, *id.;*[3] and (3) the language of 922(q) contained no jurisdictional element "which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at ——, 115 S.Ct. at 1631.

Contrary to the Defendant's contentions, *Lopez* does not mandate a finding that the CSRA is unconstitutional. Rather, the court holds that the CSRA is constitutionally sound under Category Three.

### 1. STANDARD OF REVIEW

 When reviewing the CSRA, the court's role is narrow: the court must defer to a congressional determination that the regulated activity substantially affects interstate commerce if there is any rational basis for such a finding. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. A rational basis exists when the relationship between the activity and interstate commerce is not so tenuous as to defeat all limitations on congressional power pursuant to its authority under the Commerce Clause. *Id.* at ——, 115 S.Ct. at 1632. Once a rational basis exists, the court must then decide whether the means chosen is reasonably adapted to the end permitted by the Constitution. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

 Recognizing this circuit's determination that federal "power to regulate interstate commerce is extraordinarily far-reaching," *S.S.C. Corp. v. Town of Smithtown,* 66 F.3d 502, 508 (2d Cir.1995) (Cabranes, J.), this court turns to the CSRA and an analysis of its regulation of economic activity, its legislative history, and its interstate commerce nexus.

### 2. ECONOMIC ACTIVITY

 According to *Lopez,* the possession of a firearm in a school zone was not "economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1634. A regulated activity, however, need not be commercial in order to be economic. *See Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942) ("[E]ven if [an] activity [is] local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce...."). Because the payments regulated by the CSRA have a substantial effect on the national economy, the court determines in this case they are "economic."

 The Supreme Court has consistently held that the Commerce Clause power is expansive enough to include activity which is solely intrastate. *See, e.g., Hodel,* 452 U.S. at 276–80, 101 S.Ct. at 2360–62; *Katzenbach v. McClung,* 379 U.S. 294, 299–301, 85 S.Ct. 377, 381–382, 13 L.Ed.2d 290 (1964). Although activity with only a "relatively trivial impact" on commerce is still not a sufficient basis for broad regulation, *see Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (citing *Maryland v. Wirtz,* 392 U.S. 183, 197, n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)), as long as the activity aggregated bears a substantial relation to commerce, the de minimus character of individual instances under a statute are irrelevant in a determination of constitutionality. *Id.* at ——, 115 S.Ct. at 1631.

 Support payments might not be considered traditional items of "commerce," *see United States v. Mennuti,* 639 F.2d 107, 109–10 (2d Cir.1981) ("only business-related activities constitute 'commerce'"), but the non-payment of interstate support obligations is economic activity in a way that mere posses-

---

**3.** The Court stated that, although "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," such findings assist courts in evaluating whether the regulated activity "substantially affects" interstate commerce where the effect on commerce is not obvious. *Lopez,* ——

U.S. at —— ——, 115 S.Ct. at 1631–32. Moreover, the Court refused to examine congressional findings regarding prior federal firearms legislation because § 922(q) "'represent[ed] a sharp break with the long-standing pattern'" of such legislation. *Id.* at ——, 115 S.Ct. at 1632 (quoting *Lopez,* 2 F.3d at 1366).

sion of a handgun in a school zone is not. *See United States v. Bishop*, 66 F.3d 569, 577 (3d Cir.1995). The non-custodial parent reaps an economic gain each time a support payment is withheld, while the offspring suffers an economic loss. *See id.* (carjacking is economic activity because economic gain and loss result to the victimizer and victim, respectively, whereas no such direct economic results occur from possession of a handgun in a school zone).

The magnitude of the total economic loss and concomitant gain is, significant. Congress considered that of the $48 billion in child support payments owed nationally according to court judgments, a total of $35 billion has never been collected. *See* 140 Cong.Rec. S9379, S9430 (1992). Of that amount, interstate cases are responsible for an estimated minimum of $14 billion in uncollected support. *See id.* at S9430–31.[4] Congress also considered noteworthy the fact that between 30 and 40 percent of all delinquent child support cases involve interstate obligations. *See id.*[5]

■ The substantial economic gains and losses at issue in these cases have obvious implications on interstate commerce. Given the interrelated nature of our national economy, it is inevitable that local consumption will involve consumption of goods produced out of state. Thus, the non-payment of the "past due support obligation" will reduce the child's consumption of goods in interstate commerce. It will also reduce the custodial parent's consumption of such goods to the extent any alimony[6] is included in the support obligation. Thus, the very act of with-

holding payment causes a depletion of assets that affects interstate commerce. *See United States v. Jones*, 30 F.3d 276, 284–85 (2d Cir.1994) (holding robbery of individual during illegal drug sale affects interstate commerce because individual's assets would be depleted, affecting individual's ability to purchase a commodity (cocaine) that travels in interstate commerce), *cert. denied*, —— U.S. ——, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994).

A shift in interstate market demand occasioned by non-payment would cause businesses to ship their goods to different states to accommodate this shift. Although in individual instances any perceptible shift might be small, each instance of non-payment aggregated with non-payments in other interstate support cases would inevitably force substantial shifts in the interstate flow of goods, because the total amount of interstate support owed is estimated to be billions of dollars.

## 3. LEGISLATIVE HISTORY

In contrast to the statute reviewed in *Lopez*, the CSRA produced an abundance of legislative history regarding the economic effects of the non-payment of interstate support. *See supra* notes 5 and 6 and accompanying text.

Although the states have adopted measures aimed at enforcement of child support obligations across state lines, such as the Uniform Reciprocal Enforcement of Support Act ("URESA") and extradition laws, Congress observed that the practical implementation of those measures has not been effec-

---

4. Compared to the amount of money estimated taken yearly through extortionate credit activity in *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the estimated $14 billion in total non-payments of interstate support to date is similar or greater in economic significance. *See Perez*, 402 U.S. at 155, 91 S.Ct. at 1362 ($350 million per year).

5. Approximately nine million children would benefit from this legislation, which would be applied to the approximately four million parents who are not paying their court-ordered and legal duty to pay child support. 140 Cong.Rec. at S9430.
 Further, a report from the General Accounting Office revealed that 57 percent of all custodial

parents in interstate cases reportedly receive child support payments only occasionally, seldom or never and that the statistics suggest the chances for successful avoidance of such obligations increased significantly when there is a state boundary between the child and the noncustodial parent. *See* H.R.Rep. No. 771, 102d Cong., 2d Sess. 6 (1992).

6. A "past due support obligation" is defined as an amount "determined under a court order ... pursuant to the law of a State to be due from a person for the support and maintenance of a child or *of a child and the parent with whom the child is living....*" 18 U.S.C. § 228 (emphasis added).

tive. 138 Cong.Rec. H7324, H7325 (1992).[7] The reasons for this are state boundaries and "laws and processes that differ from state to state." *See id.* at H7326.

■ The activity regulated in this case has a substantial effect on interstate commerce in part because states have been unable to enforce their own support orders through interstate enforcement efforts. *See United States v. Bishop,* 66 F.3d 569, 578 (3d Cir.1995) (finding that the states could not combat growth of carjacking industry and stating: "[l]ocal activities may become the subject of national legislation when they are found to be part of a national problem with a substantial impact on interstate commerce"); *see also* 138 Cong.Rec. at H7326. Congress need not wait until a national problem reaches crisis proportions in order to act. *See Bishop,* at 576–78.

■ Although legislative history is not necessarily a requirement for the court's finding that a rational basis for substantial effect exists in this case, *see Lopez,* —— U.S. at ——, 115 S.Ct. at 1631 (" 'Congress need [not] make particularized findings in order to legislate' ") (quoting *Perez,* 402 U.S. at 156, 91 S.Ct. at 1362), the statistics and legislative judgment provided in the CSRA's legislative history provide support for this court's conclusion that Congress acted to control a national problem with substantial effects on interstate commerce.

### 4. JURISDICTIONAL ELEMENT

■ In *Lopez,* the Supreme Court found one of the fatal flaws of the Gun–Free School Zones Act of 1990 to be the lack of an "express jurisdictional element which might limit its reach to a discrete set of firearm

possessions that additionally have an explicit connection with or effect on interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. *Lopez* cited the felon in possession statute in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) as an example of a statute with such a "jurisdictional element." That statute, former 18 U.S.C. App. § 1202(a) (now existing as 18 U.S.C. § 922(g)(1)), made it a crime for a felon to "receiv[e], posses[s], or transport *in commerce or affecting commerce* ... any firearm." (emphasis added). The Defendant argues that because the CSRA lacks the words "in commerce" or "affecting commerce" it lacks a "jurisdictional element" assuring that the regulated activity affects interstate commerce. Although the CSRA's language lacks such phrases, the statute does require that the regulated conduct have an explicit connection with or effect on interstate commerce by limiting federal regulation to *inter*state support payments and excluding *intra*state support payments.

■ A nexus to interstate commerce is the requisite connection between the regulated activity and interstate commerce. *Cf. Lopez,* —— U.S. at ——, 115 S.Ct. at 1631; *see also Scarborough v. United States,* 431 U.S. 563, 564, 97 S.Ct. 1963, 1964, 52 L.Ed.2d 582 (1977) (holding proof that possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce). By limiting regulation to interstate payments only, a nexus to interstate commerce is assured. Interstate market demand for goods in commerce would be redirected from the state of the non-custodial parent to the state of the child if non-custodial parents are com-

7. Congressman Henry Hyde cited a recent study, which revealed that of all URESA cases sent from Michigan courts to other states, only a 41% chance existed that the receiving state courts would issue an order. 138 Cong.Rec. H7324, H7326 (1992).

In hearings, the House heard of "instance after instance where spouses, usually husbands, did not want to pay, went to another State, waited just until the legal process was able to catch up with [them], and then went to another State and started the procedure all over again." 138 Cong. Rec. H7324, H7325 (1992).

A Report from the House Committee on the Judiciary accompanying the CSRA as House Bill 1241 found that states' ability to criminalize the failure to pay child support beyond their own boundaries, even though most states have adopted URESA and other improved collection efforts, is "severely limited" and that "interstate extradition and enforcement ... remains a tedious, cumbersome and slow method of collection." H.R.Rep. No. 771, 102d Cong., 2d Sess. 5–6 (1992).

pelled to make these payments. *See supra* part II.B.2. Every case brought under the CSRA will result in a change in the financial interests of residents of *different* states, assuring a "concrete tie to interstate commerce." *Lopez*, — U.S. at —, 115 S.Ct. at 1634; *see United States v. Murphy*, 893 F.Supp. 614, 615 (W.D.Va.1995).

## 5. CONCLUSION

▮ For all the foregoing reasons, the CSRA may be sustained under the line of cases which includes *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), and *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), in which individual instances viewed in the aggregate substantially affect interstate activity. *See Lopez*, — U.S. at — – —, 115 S.Ct. at 1630–31. Because it is not necessary to "pile inference upon inference" to perceive an explicit connection between the regulated activity and interstate commerce, and in light of the economic nature of the regulated activity, the legislative history, and the interstate commerce nexus within the language of the CSRA, the court concludes that the CSRA regulates a Category Three activity and finds that a rational basis exists for the conclusion that the non-payment of the "past due support obligations" substantially affects interstate commerce.[8]

## C. TENTH AMENDMENT

▮ The Defendant argues the CSRA should be held unconstitutional under the Tenth Amendment to the U.S. Constitution, federalism and comity, because the statute allegedly invades a province which traditionally has been reserved to the states—criminal enforcement of state domestic relations orders. Congress, however, can criminalize conduct outlawed by states without violating the Tenth Amendment. *See, e.g., United States v. Bishop*, 66 F.3d 569, 578 (3d Cir. 1995) (holding no imbalance created in federal-state relationship by carjacking statute, 18 U.S.C. § 2119, where carjacking, traditionally combatted on the state level, and the failure of state efforts to combat carjacking, resulted in a national problem with a substantial impact on interstate commerce). "[N]ot every federal foray into criminal law is invalid." *Id.*

▮ The Defendant's citation to *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) is unavailing. The CSRA regulates individual private conduct, not state entities. His contention that domestic relations cases are outside the jurisdiction of the federal courts also fails to defeat the statute. In *Ankenbrandt v. Richards*, 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992), the Court made it clear that any domestic relations exception is carved out of a statutory construction of federal diversity jurisdiction and is only applicable where there exists no independent basis for federal jurisdiction beyond diversity of citizenship.

▮ *Lopez* did not turn on whether a regulated activity traditionally has been the province of the states. Rather, the proper inquiry is whether the court can rationally find that an activity substantially affects interstate commerce without having to "pile inference upon inference." *Lopez*, — U.S. at —, 115 S.Ct. at 1634. Because the connection between interstate support payments and commerce is not attenuated and a rational basis exists for finding a substantial effect on interstate commerce, whether an activity is traditionally regulated by the states is not a relevant inquiry. *See Lopez,*

---

8. Because the CSRA covers only interstate transactions and contains an interstate commerce nexus within its language, it is not perfectly clear whether a *substantial* effect or some lesser effect on interstate commerce is required. *See United States v. Robertson*, — U.S. —, —, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (stating that "affecting commerce" test was developed for purely *intra*state commercial activity); *cf. United States v. Jones*, 30 F.3d 276, 284–85 (2d Cir. 1994) (holding proof to support a violation of the Hobbs Act, which contains a jurisdictional element in the statutory language, is sufficient if the effect on commerce is minimal or "postponed, indirect and slight") (citations omitted), *cert. denied*, — U.S. —, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994).

—— U.S. at ——, 115 S.Ct. at 1631–34.[9] Thus, this court finds that the CSRA is not an impermissible violation of the Tenth Amendment, but rather a rational response by Congress to a national problem that the federal government alone is equipped to handle.[10]

## D. VAGUENESS

The Defendant argues the CSRA, which is not limited to cases of parental flight across state lines to avoid paying support obligations, is impermissibly vague because its legislative history reveals congressional concern for such flight cases. He also argues the lack of any requirement that the support obligations accrue while the parent and child live in different states and the lack of a mechanism to prevent the statute's arbitrary application[11] compel the conclusion that the CSRA is void for vagueness.

■ To assert a facial challenge to a statute as impermissibly vague the Defendant must show that the statute is vague " 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' Such a provision simply has *no* core." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982) (citations omitted). He must show that the statute is "impermissibly vague in all of its applications." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.1993) (citations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993). "Lastly,

vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *Id.* (citing *Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 1928, 114 L.Ed.2d 524 (1991) and *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975)).

■ Because the statute contains a clear, objective core standard of conduct, the Defendant's facial challenge to the statute must fail. The Defendant's facial challenge must also fail because the First Amendment is not implicated in the CSRA. *See Nadi*, 996 F.2d at 550.

Any vagueness challenge by the Defendant must be analyzed in light of the specific facts of his case. *See Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 1928, 114 L.Ed.2d 524 (1991). The Defendant, however, has not advanced any such argument, leaving the court with no occasion to visit its merits or lack thereof.

## III. CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss the information (**Document # 15**) is **DENIED**.

It is so ordered.

---

**9.** This court also notes the hazards of engaging in such an inquiry, i.e. the temptation would be to make decisions about which federal policies this court favors and which it dislikes. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 546, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985).

**10.** The Defendant also argues it was incumbent upon Congress when enacting the CSRA to specify under which enumerated power(s) it was acting. There is no support in case law for the Defendant's assertion. "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner Broadcasting Sys. v. FCC*, —— U.S. ——, ——, 114

S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994). In addition, "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948); *see also Lopez*, —— U.S. at ——, 115 S.Ct. at 1631–32 (" 'Congress need [not] make particularized findings in order to legislate' ") (quoting *Perez v. United States*, 402 U.S. 146, 156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971)).

**11.** The Defendant suggests the arbitrary application would result from decisions by the child and custodial parent to cross state lines merely to invoke federal jurisdiction.