## UNITED STATES of America

v.

## Steven Paul PARKER.

### Criminal No. 95–352.

United States District Court,
E.D. Pennsylvania.

Oct. 30, 1995.

Scott J. Capriglione, Levittown, PA, for Steven Paul Parker.

Linda Dale Hoffa, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is Steven Paul Parker's ("Defendant") Motion to Dismiss Indictment,[1] and the United States of America's ("the Government") opposition thereto. For the reasons set forth below, Defendant's motion will be *granted*.

---

1. Defendant was charged by information and inaccurately titled his motion as one to dismiss "indictment."

## I. BACKGROUND

On June 29, 1995, the Government charged Defendant with willfully failing to pay a past due child support obligation in violation of section 2 of the Child Support Recovery Act of 1992 ("CSRA"), 18 U.S.C. § 228.[2] The single-count information alleges that Defendant, a resident of Fort Myers, Florida, willfully failed to pay a support obligation that was unpaid for more than one year and is in an amount greater than $5,000. The information further alleges that his two children live in a state other than Florida.

The child support obligation arises from Defendant's divorce from Wendy Parker on September 1, 1987. The divorce decree, entered by the Court of Common Pleas of Bucks County, Pennsylvania, included a Property Settlement and Separation Agreement ordering Defendant to pay Wendy Parker $100.00 each week for the support of the two children born of the marriage. The payments were to begin on October 31, 1986. The agreement provides that Defendant's support of the children shall terminate when each child reaches age eighteen or graduates from high school.[3] The record does not reveal the exact amount of arrearage, but Defendant admits that he is accused of failing to pay child support since 1990. Defendant, however, disputes that he owes unpaid child support.

Defendant was arraigned on July 27, 1995. On September 14, 1995, he moved to dismiss the information, arguing that (1) Congress's enactment of § 228 violates the Commerce Clause of the Constitution of the United States because the statute attempts to regulate an activity that does not substantially affect interstate commerce; and (2) § 228 impermissibly intrudes on the states' ability to regulate child support and criminal law as set forth in the doctrine of federalism and the Tenth Amendment to the Constitution.[4] The Government filed opposing papers on October 2, 1995, responding that (1) Congress had authority to enact § 228 under the Commerce Clause because the non-payment of child support has a substantial effect on interstate commerce and because it is a valid regulation of the use of a channel of interstate commerce; and (2) § 228 does not violate principles of federalism or the Tenth Amendment because it does not usurp the authority of the states to regulate family law and other areas of traditional state concern.[5]

## II. DISCUSSION

### A. The Commerce Clause

The Commerce Clause empowers Congress to "regulate Commerce with foreign

---

2. The statute states, in relevant part:
   (a) **Offense.**—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another state shall be punished as provided in subsection (b).
   (b) **Punishment.**—The punishment for an offense under this section is—
   (1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and
   (2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.
   (c) **Restitution.**—Upon a conviction under this section, the court shall order restitution under section 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing.
   (d) **Definitions.**—As used in this section—
   (1) The term 'past due support obligation' means any amount—
   (A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and

(B) that has remained unpaid for a period. longer than one year, or is greater than $5,000. 18 U.S.C. § 228.

3. Defendant has filed in the Bucks County court a Petition to Terminate his child support obligation to one child who has turned eighteen.

4. The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

5. The two arguments are two sides of the same coin. See New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." Id. at 156, 112 S.Ct. at 2417.

Nations, and among the several States, and with the Indian Tribes." *U.S. Const.* art. I, § 8, cl. 3. The clause was designed "to protect the national interest in facilitating commerce between the states and with foreign nations." *Pic–A–State PA, Inc. v. Pennsylvania,* 42 F.3d 175, 179 (3d Cir.1994). The Commerce Clause is the "chief source of regulatory power and, implicitly, a limitation on state legislative power." Laurence H. Tribe, *American Constitutional Law,* § 5–4, at 306 (2d ed. 1988).

Before this year, it could be fairly concluded that "commerce clause doctrine grants Congress such broad power that judicial review of the affirmative authorization for congressional action is largely a formality." *Id.* § 5–8, at 316. And while Congress may establish criminal punishment for actions that interfere with any federal interest under its Commerce Clause power, the Supreme Court had "evidenced no inclination to exercise an active review of criminal statutes enacted under the commerce power." 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 4.10(c), at 415 (1992).

The Supreme Court's approach to the Commerce Clause, however, changed course in its recent analysis and holding in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez,* the Court reexamined the scope of the Commerce Clause as it related to activities having no direct relationship with interstate commerce. The Court identified an outer limit to this broad power as it concluded that the Commerce Clause did not authorize Congress to pass a criminal statute punishing the knowing possession of a handgun in a school zone. *See id.* The decision marked the first time since 1938 that the Court cut back on the assertion of Commerce Clause power by the Congress to regulate private activity that appeared to be local in nature. *See* Rotunda & Nowak, *supra,* § 4.9, at 405.

The Court in *Lopez* summarized the development of Commerce Clause jurisprudence. It explained how congressional authority to legislate under the Commerce Clause expanded after *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed.

893 (1937), *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), to include the power not only to regulate activities that directly involved commerce among states and nations, but in addition, those that, though intrastate, could substantially affect interstate commerce. *See Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1627–29. After those cases, "the Court has undertaken to decide whether a rational basis exist[s] for concluding that a regulated activity sufficiently affected interstate commerce." *Id.* at ——, 115 S.Ct. at 1629 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)). The *Lopez* Court emphasized, however, that even as the Commerce Clause power expanded, the Court has always recognized that the power has limits. *Id.* at ——, 115 S.Ct. at 1627 (citing *Gibbons v. Ogden,* 9 Wheat. 1, 189–90, 6 L.Ed. 23 (1824); *Id.* at —— – ——, 115 S.Ct. at 1628–29 (stating that "the scope of the interstate commerce power ... 'may not be extended so as to embrace effects upon interstate commerce so indirect and remote that, to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government' ") (quoting *Jones & Laughlin Steel,* 301 U.S. at 37, 57 S.Ct. at 624).

■ The Court then explained that Congress may regulate three broad categories of activities under the Commerce Clause. The first is in regard to the use of the channels of interstate commerce. *Id.* at ——, 115 S.Ct. at 1629. Secondly, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though that threat may come only from intrastate activities. *Id.* Thirdly, Congress may regulate activities that substantially affect interstate commerce. *Id.* at ——, 115 S.Ct. at 1630; *see also Perez*

*v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971).

In this case, the Government argues that 18 U.S.C. § 228 is constitutional because it regulates an activity that (1) substantially affects interstate commerce and (2) comprises a use of the channels of interstate commerce.

### B. Activity that Substantially Affects Commerce

#### 1. The Applicable Standard

*Lopez* involved a constitutional challenge to the Gun–Free School Zones Act of 1990, a statute in which Congress made it a federal crime "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." —— U.S. at ——, 115 S.Ct. at 1626. The Court began its analysis by asking whether the activity regulated by the statute affected "commerce." *See id.* at ——, 115 S.Ct. at 1630–31. The Court answered "no" to that question and set forth the ingredients of a "commercial" activity:

> [The statute] is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. [It] is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Id.* (footnote omitted).

When recently faced with a Commerce Clause challenge to the federal carjacking statute, 18 U.S.C. § 2119, the United States Court of Appeals for our circuit announced its definition of "commerce" in light of the above excerpt from *Lopez. See United States v. Bishop,* 66 F.3d 569 (3d Cir.1995). The Third Circuit, by a divided vote, express-

ly rejected a definition of Commerce Clause power that was limited to regulation of "a voluntary economic exchange," and instead followed *Lopez'* definition of "commercial" as "including those activities which form a part of an economic enterprise." *Id.* at 581 (citing *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631). The Court of Appeals emphasized that a court's duty in evaluating whether Congress properly exercised its Commerce Clause power is to simply ensure that Congress had a rational basis for concluding that the regulated activity substantially affects interstate commerce. *Id.* at 577.

#### 2. "Commerce" and § 228

Following *Lopez* and *Bishop,* a court's duty is to first determine the nature of the regulated activity and, then, evaluate whether Congress could rationally conclude that it substantially affects interstate commerce. Section 228 criminalizes the willful failure to pay child support obligations that are either one year overdue or are greater than $5,000, when the parent-debtor and the child-beneficiary are residents of different states. To simplify matters, the court will characterize the regulated activity as the willful failure to pay child support.

The next question is whether this regulated activity substantially affects interstate commerce. The Supreme Court in *Lopez* and the Third Circuit in *Bishop* defined "commercial" as "including those activities which form a part of an economic enterprise." *Bishop,* 66 F.3d at 581 (citing *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631). Applying these factors to § 228, it is plain to this court that Congress had no rational basis to conclude that the willful failure to pay a child support obligation substantially affects commerce principally because that activity, in the words of Chief Justice Rehnquist, "has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms."[6] *Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1630–31.

An obligation to pay child support is a debt arising from a state court divorce decree that is intended to benefit a custodial parent and

---

**6.** Another district court recently reached the same conclusion in a case with facts almost identical to this case. *See United States v.*

*Schroeder,* 894 F.Supp. 360 (D.Ariz.1995); *United States v. Mussari,* 894 F.Supp. 1360 (D.Ariz. 1995).

children in the aftermath of a family break-up. The obligation is created when some or all of the members of a family as defined by state law stand before a state court having jurisdiction over such matters in a single state. In many child support cases, including this case, the noncustodial parent is required under state law to make the payment to the state,[7] and the money is then forwarded by the state to the beneficiaries. The failure to make these payments affects primarily the parents and the children born of or dependent upon the marriage. Arm's-length commercial actors are not involved in any way. The marketplace for goods and services and prices of commodities are not affected at all. There are no affiliates or cohorts that comprise part of a greater economic network or enterprise. A citizen's ability to travel is not threatened. A willful failure to pay a court-ordered sum, without more, involves no other crimes. The activity at issue, therefore, has simply nothing to do with commerce in the context of the limited power given to the federal government and withheld from the states in the Commerce Clause.

The failure to pay child support in the § 228 context, however, does have a few minimal links with interstate activity. Child support payments owed by a noncustodial parent in one state to a custodial parent and children in another state contemplate a financial transfer across state lines, most likely through the mail. The failure to make payments of debts due implicates some interstate activity if the debt is to be collected or prosecution is to occur, because extraditing the debtor or investigating the debtor's

whereabouts necessarily involves out-of-state travel or cross-state telephone contacts. Further, under § 228, either the defendant or the child or children to be supported must have traveled to another state sometime after the support order was entered to trigger the prosecution. Obviously, the obligation contemplates a payment of United States currency, admittedly the bedrock common denominator for all commercial transactions and economic activity in the nation.

■ These ties to interstate activity, however, are not enough to characterize the willful failure to pay child support as the sort of economic enterprise that substantially affects interstate commerce as defined by the Supreme Court and Third Circuit. Further, the fact that the states are experiencing difficulty in fulfilling their expectations in the exercise of their power here does not somehow produce a form of chameleonic conversion of this activity from a state power to a federal one. Congress's attempt to regulate this activity is not accompanied by an essential enumerated source of constitutional power, meaning that, under the Tenth Amendment, the power to regulate this activity is reserved exclusively to the states, or to the people. The statute is unconstitutional.

### 3. Legislative Factfinding

■ The court's review of the legislative history of the CSRA[8] persuades it that Congress had no rational basis to conclude that the willful failure to pay child support substantially affects interstate commerce. When enacting laws under its Commerce

---

**7.** In this case, for example, Defendant was required to make his payments to the Domestic Relations Court of Bucks County, Pennsylvania. (Gov't's Mem.Opp.Mot. to Dismiss at 8).

**8.** The CSRA contained more than § 228. Section 4 of the CSRA seeks to help enforce § 228 with provisions by which states and local child support enforcement agencies may apply for and receive from the Director of the Bureau of Justice Assistance grants "to develop, implement, and enforce criminal interstate child support legislation and coordinate criminal interstate child support enforcement efforts." CSRA § 4(a) (amending 42 U.S.C. § 3711 et seq.). The federal share of a grant may provide as much as 75% of the cost of the project. Id.

In addition, section 5 of the CSRA establishes the Commission on Child and Family Welfare, composed of 15 members who are charged with (1) compiling information on issues that affect the best interests of children; (2) writing a report that lists the strengths and weaknesses of the child welfare system and recommends changes to the system or new federal roles in strengthening the system; (3) studying the strengths and weaknesses of the juvenile and family courts as they relate to visitation, custody, and child support enforcement; and (4) studying domestic issues that relate to treatment and placement of children and recommending any needed changes. CSRA § 5 (amending 42 U.S.C. § 3793(a)).

Clause power, Congress need not make formal findings of fact as to the substantial burdens that an activity has on interstate commerce. *See Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1631–32. However, a court may consider legislative factfinding as an aid in evaluating whether Congress had a rational basis for concluding a federal criminal statute substantially affects interstate commerce. *Id.*

According to a House Judiciary Committee report accompanying the bill, Congress enacted § 228 as a complement to existing federal-state partnerships to collect child support and state civil and criminal laws aimed at past due child support obligations. *H.R.Rep. No.* 771, 102d Cong., 2d Sess. (1992). Section 228 addresses the problem of interstate enforcement of child support by

> taking the incentive out of moving interstate to avoid payment.... [Interstate cases] are the cases which state officials report to be clearly the most difficult to enforce, especially the "hard core" group of parents who flagrantly refuse to pay and whom traditional extradition procedures have utterly failed to bring to justice.

*Id.* The Government, in an effort to show that child support arrearages substantially affect interstate commerce, cites the report, which discloses the following statistics:

● Ten *million women head households* with a child whose father is absent from the home, an increase of thirty-nine percent in just over a decade. About sixteen million children live in these homes.

● The poverty rate of families with children from an absent father has risen steadily throughout the 1980s. More than three million such families were below the official government poverty level in 1989, a poverty rate of 32.2 percent.

● In 1989, $16.3 billion in child support payments were due, but only $11.2 billion were made. The $5.1 billion annual deficit greatly increases the cost to the state and federal governments in helping these families "make ends meet." For instance, in 1988, 6.4 million children from homes in which the father was absent were enrolled in the Aid to Families with Dependent Children program.

● A federal-state partnership designed to collect unpaid child support has grown tremendously between 1976, when it collected $512 million, and 1988, when it collected $4.6 billion. Congress expanded the methods of collecting child support in 1984 and 1988, but the annual deficit in child support payments remains unacceptably high, especially in interstate cases.

● One-third of child support cases concern a child whose father lives in a different state and require interstate collection. Fifty-seven percent of the custodial parents in interstate cases reported receiving support payments occasionally, seldom or never.

● A significant number of parents who fail to pay child support do so intentionally. The statistics above suggest that their chances for successfully avoiding such payments increase markedly when they cross state lines.

These facts paint an unsettling portrait of a growing national problem. They do not, however, prove that Congress had a rational basis to conclude that the failure to pay child support obligations substantially affects interstate commerce.[9] The strongest

---

9. The floor debate before passage of the Child Support Recovery Act of 1992 reveals that the statute's sponsors may not have truly understood the scope of § 228. At least four veteran legislators stated that the bill criminalized the act of fleeing to another state to avoid payment of child support obligations. *See* 138 Cong.Rec. H11,071 (daily ed. Oct. 3, 1992) (statement of Rep. Brooks) (stating that the bill imposes criminal punishment for "flight to avoid payment of arrearages in child support"); *id.* (statement of Rep. Hyde) (stating that the CSRA "makes a Federal crime out of anyone who crosses a state line willfully to avoid paying child support"); *id.* (statement of Rep. Hoyer) (stating that "it is, I think, excellent policy, long overdue, that the

Nation addresses those who abandon and cross State lines to avoid the support of their children"); 138 Cong.Rec. S14,095 (daily ed. Sept. 18, 1992) (statement of Sen. Ford) (calling the CSRA "a bill to impose a criminal penalty for flight to avoid payment of arrearages in child support"). *But see* 138 Cong.Rec. S17,131 (daily ed. Oct. 7, 1992) (statement of Sen. Kohl) (stating that the bill "makes it a Federal offense for noncustodial parents who live in another State to evade their child support obligations"). The broad statutory language, however, also covers persons who move to other states for reasons other than avoiding their child support obligation. No evidence in the record suggests that

link to interstate commerce is the $5.1 billion annual deficit in child support payments in 1989.[10] But the mere fact that an activity involves billions of dollars, without more, is insufficient to show a substantial relationship between the activity and interstate commerce. The activity's relationship to interstate commerce must be shown first. Using dollar figures to establish the necessary relationship is putting the cart before the horse because it addresses whether an activity's relationship with commerce is *substantial,* and not whether the activity affects "*commerce*" in the first place. The Supreme Court has held, in cases in which the monetary effect of an activity was relatively minimal, that Congress had a rational basis for believing that the activity substantially affected interstate commerce. *See, e.g., Hodel v. Indiana,* 452 U.S. 314, 325 n. 11, 101 S.Ct. 2376, 2383 n. 11, 69 L.Ed.2d 40 (1981) (disagreeing with the district court's finding that the amount of corn production at issue, valued at about $5.16 million, was an insignificant amount of commerce); *Perez v. United States,* 402 U.S. 146, 155, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971) (upholding federal criminal statute prohibiting intrastate extortionate credit transactions when Congress found that "organized crime takes over $350 million a year from America's poor through loan-sharking alone"). However, this year, in *Lopez,* the Court demonstrated that the focus must be on the activity, not the dollar figure. In fact, the *Lopez* Court did not mention the monetary effects on the economy caused by possessing a handgun in a school zone. Instead, it focused exclusively on the nature of the regulated activity and concluded that possessing a gun in a school zone had "nothing to do with 'commerce' or any sort of economic enterprise." — U.S. at ———–———, 115 S.Ct. at 1630–31.

#### 4. The Link to Interstate Commerce

The court also rejects the Government's theories attempting to show the activity's substantial relationship to interstate commerce. First, under what can be labeled the "basic necessities" theory, the Government reasons that the nonpayment of child support causes many custodial parents and their children to be unable to afford sufficient housing, food, medical care and other goods and services. The Government argues that the inability to pay for these basic necessities constitutes a "clear impact on the commerce among the states." (Gov't's Mem. Opp. Mot. to Dismiss at 4). Second, in what can be described as the "federal subsidy" theory, the Government argues that nonpayment of support orders causes many women and children to become dependent upon welfare and other programs that are funded by federal money, and this substantially affects interstate commerce. *Id.* at 5.

Neither theory can withstand scrutiny in light of *Lopez.* In that case, the Government asserted two theories explaining why the possession of handguns in school zones substantially affected interstate commerce. First, under what the Court termed the "cost of crime" reasoning, the Government suggested that the costs of violent crime are substantial, that these costs are spread throughout the population, and that this constituted a significant effect on the national economy. — U.S. at ——, 115 S.Ct. at 1632. The Court flatly rejected this argument, stating that such reasoning would empower Congress to "regulate not only violent crime, but all activities that might lead to violent crime, regardless of how tenuous they relate to interstate commerce." *Id.*

Second, the Court considered what it called the Government's "national productivity" reasoning. The Government argued that the presence of guns in schools substantially threatens the educational process by threatening the learning environment, that this threat would result in a less productive citizenry and that this effect would adversely affect the country's economic well-being. *Id.* The Court rejected this line of reasoning

---

Defendant fled to Florida for the purpose of avoiding his child support obligation to his children.

**10.** This figure apparently includes interstate and intrastate child support arrearages for 1989.

The Government notes that 30% of child support cases involve interstate obligations. However, 90% of this money is not collected. (Gov't's Mem.Opp.Mot. to Dismiss at 5).

because it would enable Congress to "regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example." *Id.*

Evaluating the Government's two theories, the *Lopez* Court concluded:

> [I]t is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate.

*Id.* Further expressing its opposition to such attenuated chain-link arguments, the Court stressed: "To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at ——, 115 S.Ct. at 1634.

The Government's theories here are unpersuasive tag-along theories that are no different than the ones condemned by the *Lopez* Court. Under the "basic necessities" theory, Congress would have power to enact a criminal offense prohibiting any crime that deprives another person of money. Congress, under this scenario, could punish embezzlers, con artists, and muggers—even if their activity was solely intrastate—because the proceeds of the crimes likely would have helped the victim afford food, housing, medical care, or other goods and services. If the court were to follow this reasoning, it would be converting traditionally state-enforced, common-law crimes of theft into federal crimes, thus derogating the constitutionally critical "distinction between what is truly national and what is truly local." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1634. The "basic necessities" theory, therefore, is almost identical to the "national productivity" theory that the *Lopez* Court rejected and, thus, does not prove that nonpayment of child support has a significant effect on interstate commerce.[11]

■ For the same reasons, this court also rejects the Government's "federal subsidy" theory. Simply showing that an activity somehow might diminish a family's budget, thus causing it to request federal welfare assistance, is too attenuated a link to interstate commerce upon which to ground Con-

---

11. Other district courts recently have relied on similar reasoning to uphold § 228. *See United States v. Hampshire*, 892 F.Supp. 1327 (D.Kan. 1995). The court stated:

> [I]t would appear that the failure to pay child support has an effect on interstate commerce sufficient to comply with constitutional requirements. In enacting the CSRA, the House of Representatives noted that 3.2 million families lived below the poverty level in 1989. The avoidance of child support obligations exacerbates the problem of child poverty, requiring the government to expend its own resources to help alleviate the problem. Of the $16.3 billion due in child support payments in 1989, only $11.2 billion in payments were actually made.

*Id.* at 1329–30 (citations omitted).

The district court in *United States v. Sage*, 906 F.Supp. 84 (D.Conn.1995), stated:

> Given the interrelated nature of our national economy, it is inevitable that local consumption will involve goods produced out of state. Thus, the non-payment of the "past due support obligation" will reduce the child's consumption of goods in interstate commerce. It will also reduce the custodial parent's consumption of such goods to the extent any alimony is included in the support obligation. Thus, the very act of withholding payment causes a depletion of assets that affects interstate commerce.
>
> A shift in interstate market demand occasioned by non-payment would cause businesses to ship their goods to different states to accommodate this shift. Although in individual instances any perceptible shift might be small, each instance of non-payment aggregated with non-payments in other interstate support cases would inevitably force substantial shifts in the interstate flow of goods, because the total amount of interstate support owed is estimated to be billions of dollars.

*Id.* at 90 (citations omitted).

This court believes that the links to interstate commerce described in the above excerpts are analogous to the "costs of crime" and "national productivity" theories that the Supreme Court rejected in *Lopez*. If Congress can use such vague, inferential leaps to invoke its Commerce Clause power, it could regulate any crime that depletes another person's assets. This court believes that the Commerce Clause, after the *Lopez* decision, is not so broad, and that § 228 invades the power of the states to regulate matters of local concern as reserved to them in the Tenth Amendment.

gress's Commerce Clause power. The Government must prove that the regulated activity substantially affects interstate commerce, not that the regulated activity has a possible effect on another activity that is in interstate commerce. This change in analysis is perhaps *Lopez'* greatest impact on Commerce Clause jurisprudence. The Government's causal analysis, therefore, fails to support the constitutionality of § 228.

### 5. Case Law

The court's conclusion also is supported by Supreme Court and Third Circuit cases, cited *supra*, that have addressed facts similar to the ones in this case. In *Lopez*, the Court characterized the case of *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), as "perhaps the most far-reaching example of Commerce Clause authority of intrastate activity." —— U.S. at ——, 115 S.Ct. at 1630. The Court thus identified *Wickard* as the outer boundary of Congress's Commerce Clause power. In *Wickard*, Congress had enacted the Agricultural Adjustment Act of 1938 to control the volume of wheat moving in interstate commerce and stabilize wheat prices across the nation. 317 U.S. at 115, 63 S.Ct. at 84. The Act directed the Secretary of Agriculture each year to announce a national acreage allotment for the next crop of wheat, which was apportioned to the states and the counties and eventually broken into allotments for individual farms. *Id.*

The Secretary imposed a penalty under the Act against Filburn, a wheat farmer who in 1941 harvested 23 acres of wheat, 11.9 acres more than the Secretary allotted him. *Id.* at 114, 63 S.Ct. at 83. Even though Filburn sold only a portion of his crop, using the remainder to feed poultry and livestock, make flour for home consumption, and seed future crops, the Secretary penalized him forty-nine cents for every bushel of excess wheat he harvested. *Id.* at 114–15, 63 S.Ct. at 83–84. Filburn appealed the penalty, alleging that Congress had no authority under the Commerce Clause to enact the Agriculture Adjustment Act because it regulated the production of goods intended solely for home consumption. *Id.* at 118, 63 S.Ct. at 86. The

Court upheld the Act, reasoning that the home-grown, home-consumed wheat grown by Filburn, if taken together with the many other farmers who also grew excess wheat for personal or farm use, would compete with wheat sold in interstate commerce. *Id.* at 127–28, 63 S.Ct. at 90–91. The Court stated:

> One of the primary purposes of the Act in question was to increase the market price of wheat, and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in a marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon. This record leaves us in no doubt that Congress may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices.

*Id.*

The relationship between the home-grown, home-consumed wheat in *Wickard* and interstate commerce is much stronger than the link between the willful nonpayment of child support obligations and interstate commerce. The Court held that the activity in *Wickard*, the production of wheat for home consumption, competed directly with wheat that was intended for sale in the marketplace. The Court reasoned that the home-produced wheat increased the price of wheat on the market because it would restrict "the amount which may be produced for market and the extent as well which one may forestall resort to the market by producing to meet his own needs." *Id.* at 127, 63 S.Ct. at 90. Further,

the Court held, the activity disrupted a national wheat pricing scheme that, with the country on the brink of war, was designed to carefully balance supply and demand so as to "avoid the surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce." *Id.* at 115, 63 S.Ct. at 84.

In this case, the failure to pay child support has no effect on prices of goods or services in interstate commerce. No national regulatory scheme governs child support payments. The fact that the wheat grown in *Wickard* was entirely intrastate, and the unpaid child support obligation made criminal under § 228 is owed by a noncustodial parent who lives in a state different from the child, is immaterial. The Court, in determining whether an activity substantially affected interstate commerce, has never distinguished between wholly interstate activities and intrastate activities that affect interstate commerce.[12] Rather, the Court has always inquired as to the activity's relationship with interstate commerce, not whether the activity is itself characterized as interstate or intrastate. Thus, because the Court has stated that *Wickard* represents the furthest reach of congressional power under the Commerce Clause, and the activity in this case has a much weaker relationship with interstate commerce, *Wickard* does not require that this court uphold § 228 as a valid exercise of congressional power under the Commerce Clause.

In *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Court upheld Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891, which punishes "extortionate credit transactions," defined as those that are enforced by the threat of "violence or other criminal means." *Id.* at 147, 91 S.Ct. at 1358. The Court held that such transactions, even if "purely intrastate," may, in the judgment of Congress, affect interstate commerce. *Id.* at 154, 91 S.Ct. at 1361. Essential to this conclusion was the Court's finding that "there is a tie-in between local loan sharks and interstate crime." *Id.* at 155, 91 S.Ct. at 1362. The Court found that the loan-sharking business is "controlled by an organized criminal syndicate," *id.* at 155, 91 S.Ct. at 1362, "and causes the takeover by racketeers of legitimate businesses," *id.* at 156, 91 S.Ct. at 1362. The Court stated that "loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations." *Id.* at 157, 91 S.Ct. at 1363.

The willful failure of child support has a much weaker relationship to interstate commerce than the extortionate credit transactions described in *Perez.* First, a person who intentionally fails to pay child support usually does so apart from any national enterprise or syndicate. Second, the nonpayment of support obligations does not affect the independence of any businesses. Third, unlike the facts of *Perez,* there is no "tie-in" between willful failures to pay a child support obligation and interstate crime.

Further, the Third Circuit's recent decision in *United States v. Bishop,* 66 F.3d 569 (3d Cir.1995), does not require this court to uphold § 228. In *Bishop,* the court rejected a Commerce Clause challenge to the federal carjacking criminal statute, 18 U.S.C. § 2119.[13] In reaching this conclusion, the Third Circuit cited the following congressional findings linking this intrastate property

12. This court thus disagrees with the conclusion of the magistrate judge in *United States v. Murphy,* 893 F.Supp. 614, 617 (W.D.Va.1995), that *Lopez* is inapposite because the Court "was clearly concerned only with Congress' intrusion into the area of *intrastate* activity."

13. The statute reads:
Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
(1) be fined under this title or imprisoned not more than 15 years, or both,
(2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
(3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.
18 U.S.C. § 2119.

crime to an international profit-making enterprise that deprived citizens of as much as $9 billion. 66 F.3d at 579. Congress found that auto thieves bring the stolen cars to "chop shops" where they are dismantled and sold for parts, "wash" titles by obtaining an apparently valid title for the stolen cars, and export the stolen cars for sale abroad. *Id.* Congress also found that carjacking typically involves the use of guns. *Id.* at 579. Further, according to the Third Circuit, Congress found that

> auto theft is an interstate problem—both that it is often an interstate business itself (albeit an illegal one) and that it gnawed away at the innards of the American economy by imposing other costs on society as well. Congress believed that auto theft was a vast, illicit trade substantially affecting interstate and foreign commerce. Auto theft cost consumers both through the direct economic losses caused by having their property taken from them, and through increased insurance costs. Congress further believed that carjacking was not mere joyriding, but a new and violent form of the illicit interstate business of auto theft. Finally, Congress believed that the national problem of auto theft required a comprehensive, national response addressing the many different aspects of the auto theft problem, because prior state efforts had failed to combat the problem effectively.

*Id.* at 580. With this evidence, the Third Circuit held, Congress could have rationally concluded that carjacking is "a profit-making crime, and one which was a growing part of the interstate and international auto theft problem." *Id.*

Certain features of the willful failure to pay child support are similar to the carjacking problem. For example, both activities erode the fabric of the American economy by imposing costs on society. Both activities are malicious, cowardly acts that inflict serious harm on their victims. In addition, both activities are national problems that have escaped state and federal solutions. Furthermore, just as an unpaid child support debt spans state lines, the stolen cars cross state borders as part of that criminal business.

But the willful failure to pay child support is different from carjacking in several fundamental respects. First, the noncustodial spouse who owes the money but willfully does not pay does not do so to generate a "profit" in the usual sense of the word. He or she may be keeping money that rightfully belongs to the children and comes out ahead in that regard, but there is no plan to secure a return on an investment, as the term "profit" connotes. Second, willfully avoiding a past due child support obligation typically is not accompanied by the commission of other crimes. Third, the intentional nonpayment of child support is not a component of a greater enterprise, network or business engaged in depriving custodial parents and children of payments to which they are legally entitled. These three facets of the problem lead this court to conclude that *Bishop* cannot govern the outcome of this case. The relationship between carjacking and interstate commerce is stronger than the relationship between home-grown wheat and interstate commerce in *Wickard,* and it belongs on the constitutional side of the Commerce Clause spectrum. In fact, *Bishop* and *Perez* are very similar because both carjacking and loansharking involve criminal enterprises that are highly organized, have nationwide contacts and produce handsome profits from illegal transactions. In contrast, the relationship between the failure to pay past due child support obligations and interstate commerce is much weaker than *Bishop, Perez,* and *Wickard* and, thus, requires the holding that § 228 is invalid as an unconstitutional act of Congress.

Finally, the court concludes that this case is comparable to *Lopez,* which held that a criminal statute that outlawed the possession of a handgun in a school zone was unconstitutional. —— U.S. at ——, 115 S.Ct. at 1625 (1995). Neither the possession of a handgun nor the willful failure to pay child support involve "enterprises" that deal in interstate commerce. The only way to connect these activities to interstate commerce is to create an attenuated causal chain of the sort rejected by the *Lopez* Court. Neither activity

involves buying, selling, prices, commercial intercourse, marketplace activity, or any kind of arms-length transaction. Like the possession of a handgun in a school zone, the failure to pay child support has nothing to do with commerce because it does not form part of an economic enterprise and has no significant interstate features.

### C. Regulation of a Channel of Interstate Commerce

The Government also argues that § 228 is constitutional because it fits within the category of permissible Commerce Clause regulation of a "the use of the channels of interstate commerce." *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1629; *Perez*, 402 U.S. at 150, 91 S.Ct. at 1359. The Government sets forth two theories to support this proposition. First, it reasons, Defendant, who resides in Florida, was to deliver his child support payments to Pennsylvania, and this transfer "would move in interstate commerce and thus involve the use of the channels of interstate commerce." (Gov't's Mem.Opp.Mot. to Dismiss at 8). Second, the Government argues, Defendant's move from Pennsylvania to Florida involved the use of the channels of interstate commerce.

■ These vague arguments are meritless. By "channels of interstate commerce," the Supreme Court is referring to the interstate transportation routes through which persons and goods move. *See Perez*, 402 U.S. at 150,

91 S.Ct. at 1359 (citing criminal statutes punishing the shipment of stolen goods or of persons who have been kidnapped as falling into this category); *Heart of Atlanta Motel*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding a federal statute that prohibited racial discrimination as applied to a motel that served interstate travelers); *Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding a federal statute that prohibited the shipment in interstate commerce of goods produced for interstate commerce by employees whose wages and hours of employment do not conform to the statute). The Government argues that regulation of the "channels of interstate commerce" includes the regulation of goods or persons in interstate commerce. (Gov't's Mem. Opp.Mot. to Dismiss at 9–11). To this end, it cites several Mann Act [14] convictions and other cases that prove that Congress's Commerce Clause power allows it to regulate goods and persons travelling interstate for non-commercial purposes.[15] *See id.*

■ Section 228, however, does not regulate the movement of goods or persons in interstate commerce. It regulates the willful failure to pay a past due child support obligation. The unpaid money in child support arrearage cases is not a "good." Even if it were, when a person is charged with the willful failure to pay child support, he or she is being charged with *not* transferring money across state lines. Indeed, in the circum-

14. The Mann Act, also known as the White Slave Act, was enacted in 1910 and prohibited the transportation in interstate and foreign commerce for immoral purposes of women and girls. 36 Stat. 825, ch. 395.

15. The Government cites *United States v. Orito*, 413 U.S. 139, 143, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973) (holding that Congress may regulate the interstate transportation of obscene material even if the material is transported by private carriage or is intended for the private use of the transporter); *United States v. Guest*, 383 U.S. 745, 758–59, 86 S.Ct. 1170, 1178–79, 16 L.Ed.2d 239 (1966) (stating that the Commerce Clause power "encompasses the movement in interstate commerce of persons as well as commodities"); *Cleveland v. United States*, 329 U.S. 14, 17, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946) (affirming a Mann Act conviction for the non-commercial, interstate transport of women); *Brooks v. United States*, 267 U.S. 432, 437, 45 S.Ct. 345, 346, 69 L.Ed. 699 (1925) (stating that

*Hoke* and *Caminetti* stand for the proposition that Congress may punish the non-commercial enticing of women from one state to another for immoral ends); *United States v. Hill*, 248 U.S. 420, 423–24, 39 S.Ct. 143, 144–45, 63 L.Ed. 337 (1919) (affirming conviction under a federal statute when defendant brought intoxicating liquor across state lines for non-commercial purposes); *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (affirming Mann Act convictions as applied to non-commercial, interstate transport of women); *Hoke v. United States*, 227 U.S. 308, 320, 33 S.Ct. 281, 283, 57 L.Ed. 523 (1913) (upholding the constitutionality of the Mann Act).

These cases concern statutes that "relate to the prohibition of interstate transportation incident to some other crime," Rotunda & Nowak, *supra*, § 4.10(c), at 414 (footnote omitted), and are inapposite in this context.

stance where the dependent child moves out of state, the parent who is required to make the payment to the state does not get involved in an interstate transaction at all. Further, because § 228 does not regulate the shipping of goods or the movement of persons in interstate commerce, *Darby* and *Heart of Atlanta Motel* are inapplicable. For these reasons, § 228 does not involve the regulation of a "use or channel of interstate commerce."

### D. Requirement of a Jurisdictional Element

Because this court concludes that the willful failure to pay child support has nothing to do with commerce, § 228 also fails to pass constitutional muster because it contains no jurisdictional element that ensures, through case-by-case inquiry, that the failure to pay child support at issue affects interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631; *Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977); *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). The statute is limited to cases in which the noncustodial parent and the child-beneficiary reside in different states. The court has held, *supra,* that the willful failure to pay child support has nothing to do with commerce. It follows that the failure to pay child support does not affect interstate commerce, and § 228 is unconstitutional because it lacks the requisite jurisdictional element.

### III. CONCLUSION

Parents who willfully deprive their children of financial support are cruel and heartless, and cause harm that often is irreparable. Those who make our laws sometimes succumb in desperation and even frustration to the socially appealing temptation to exact swift and remedial justice through what may be the only available means, the federal criminal laws. In our tripartite system of government, however, the judiciary must ensure that Congress acts, no matter how compelling the need or how convenient the means, only in accordance with both the terms and the meaning of the Constitution. In its effort to solve the problem being experienced by many states in collecting unpaid child support, Congress, though well-intentioned, exceeded its authority and invaded the realm of sovereignty carefully reserved to the states. For this reason, § 228 must be stricken as unconstitutional.

Congress in this context had no rational basis to conclude that the willful failure to pay past due child support obligations substantially affected interstate commerce or comprised a regulation of the use of a channel of interstate commerce. The statute, 18 U.S.C. § 228, was therefore enacted without congressional authorization and is unconstitutional as inconsistent with the Tenth Amendment. For this reason, Defendant's motion to dismiss the information will be *granted.*

An appropriate Order follows.

### ORDER

AND NOW, TO WIT, this 30th day of October, 1995, upon consideration of Defendant's motion to dismiss the information, and the Government's response thereto, IT IS ORDERED that said motion is GRANTED.