UNITED STATES of America

v.

**Jeffrey GANAPOSKI, Defendant.**

No. 4:CR–96–0129.

United States District Court,
M.D. Pennsylvania.

July 1, 1996.

---

Barbara Kosik Whitaker, Assistant United States Attorney, Scranton, PA, for United States of America.

Jeffrey Ganaposki, pro se.

Melinda Christina Ghilardi, Assistant Federal Public Defender, Scranton, PA, Stand–by counsel for defendant.

### *MEMORANDUM*

McCLURE, District Judge.

### *BACKGROUND:*

On March 11, 1996, the United States Attorney for the Middle District of Pennsylvania filed an information charging defendant Jeffrey Ganaposki with failing to pay child support with respect to a child who resides in another state in violation of 18 U.S.C. § 228(a). According to the information, Ganaposki is a resident of Georgia, while the child is a resident of Pennsylvania.

Ganaposki originally was released on a $1,000.00 unsecured bond. Following a hearing on a "Notice of Revocation" filed by Ganaposki, the court vacated the release order because it appeared that no condition or combination of conditions could reasonably assure his appearance before the court as required. Ganaposki currently is in state custody for criminal contempt of court, also related to his child support obligations.

Before the court are: a document captioned "Motions to Abate, Dismiss, and Discharge"; a document captioned "Refusal of Fraud" and "Notice of Intent"; and a document captioned "Notice of Fraud and Intent to Defraud." The documents were filed by Ganaposki.

## DISCUSSION:

The "Motions to Abate, Dismiss, and Discharge" sets forth various bases for dismissal of the information. Most of them are clearly without any merit and will not be addressed further. Only two of the issues raised by Ganaposki are worth discussion. The first is the alleged lack of a showing, on the record, of probable cause for an arrest. This issue was discussed in our Order of Court dated June 10, 1996. Nothing in Ganaposki's "Motions" and the brief in support thereof changes our earlier determination.

The other issue of arguable merit is the question of whether the statute under which Ganaposki was charged, the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228, is constitutional. Several district courts have held that there is not a sufficient nexus between the statute and the Commerce Clause to warrant the exercise of federal authority, while other district courts have taken the opposite view. *Compare United States v. Nichols*, 928 F.Supp. 302 (S.D.N.Y.1996) (also citing *United States v. Sims*, No. 95–Cr–125 (W.D.Ok. filed Feb. 22, 1996); *United States v. Wilson*, No. 4:95–MG–3026 (N.D.Ohio filed November 7, 1995); all finding that § 228 is constitutional); *United States v. Collins*, 921 F.Supp. 1028 (W.D.N.Y.1996) (opinion of magistrate judge; constitutional); *United States v. Kegel*, 916 F.Supp. 1233 (M.D.Fla.1996) (opinion of magistrate judge; constitutional); *United States v. Sage*, 906 F.Supp. 84 (D.Conn.1995) (constitutional); *United States v. Hopper*, 899 F.Supp. 389 (S.D.Ind.1995) (opinion of magistrate judge; constitutional); *United States v. Murphy*, 893 F.Supp. 614 (W.D.Va.1995) (opinion of magistrate judge; constitutional); *United States v. Hampshire*, 892 F.Supp. 1327 (D.Kan.1995) (constitutional), *with United States v. Parker*, 911 F.Supp. 830 (E.D.Pa. 1995) (unconstitutional); *United States v. Bailey*, 902 F.Supp. 727 (W.D.Tex.1995) (unconstitutional); *United States v. Mussari*, 894 F.Supp. 1360 (D.Ariz.), *reconsideration denied*, 912 F.Supp. 1248 (D.Ariz.1995); *United States v. Schroeder*, 894 F.Supp. 360 (D.Ariz.), *reconsideration denied*, 912 F.Supp. 1240 (D.Ariz.1995) (unconstitutional). *See also United States v. Bongiorno*, 1996 WL 208508 (D.Mass. filed January 25, 1996) (granting in part and denying in part motion to stay execution of sentence pending appeal of "substantial constitutional issues" following conviction under § 228).

We agree with those courts which have examined the CSRA and found it to pass constitutional muster. Because this conclusion is in conflict with the only other opinion to date in this circuit, we will explain the conclusion at some length. However, since several of the opinions cited in the preceding paragraph set forth a thorough analysis of the issues, *see esp. Nichols*, our opinion will not be exhaustive. Rather, we will focus on the recent, controlling Supreme Court and Third Circuit opinions and explain our differences with the conclusion reached in *Parker*.

### I. SUPREME COURT PRECEDENT

In *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court reviewed the Gun–Free School Zones Act of 1990. In part, that act created a federal offense knowingly to possess a firearm in a school zone. 18 U.S.C. § 922(q)(1)(A) (now 18 U.S.C. § 922(q)(2)(A)). The Supreme Court analyzed the statute under the Commerce Clause of the Constitution. U.S. Const. Art. I, § 8, cl. 3. The Court reviewed the history of Commerce Clause decisions, including the expansion of congressional authority following the "watershed case" of *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). *Lopez* at ——, 115 S.Ct. at 1628, 131 L.Ed.2d at 635. In a line of cases following *Jones & Laughlin*, the Court upheld a number of statutes under the Commerce Clause, but always with the reservation that Congress' authority under the Clause had its limits. *Lopez* at —— ——, 115 S.Ct. at 1628–1630, 131 L.Ed.2d at 635–637.

Based on its review of its prior cases, the Court concluded that there are three broad categories of activity which Congress may regulate or protect under the power delegated to it through the Commerce Clause: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate

commerce, even though the threat may arise only from intrastate activity; and (3) activities having a substantial relation to or which substantially affect interstate commerce. *Id.* at ——— ———, 115 S.Ct. at 1629–1630, 131 L.Ed.2d at 637. The first two categories were not at issue in the case before the Court. *Id.* at ——— ———, 115 S.Ct. at 1629–1631, 131 L.Ed.2d at 637–638.

The Court first found that possession of a firearm in a school zone is neither an economic activity in itself nor a part of a larger economic activity. *Id.* at ——— ———, 115 S.Ct. at 1630–1631, 131 L.Ed.2d at 638–639. The statute also did not have as a jurisdictional requirement an element that the firearm possession affected interstate commerce, leaving the question of whether "mere possession" of a firearm is subject to Congressional regulation. *Id.* at ———, 115 S.Ct. at 1631, 131 L.Ed.2d at 639. The Court then noted that Congress had not made findings as to the effect on interstate commerce of carrying a firearm in a school zone, rendering it impossible to evaluate the exercise of legislative judgment, and the Court declined to presume that adequate findings would be made because of "institutional expertise" on the part of Congress. *Id.* at ——— ———, 115 S.Ct. at 1631–1632, 131 L.Ed.2d at 639–640. This left the Court to determine whether proffered ways in which possession of a firearm in a school zone may affect interstate commerce. *Id.* at ——— ———, 115 S.Ct. at 1631–1632, 131 L.Ed.2d at 640.

The government posed three basic arguments: that the cost of crime is substantial and is spread throughout society; that violent crime reduces the willingness of individuals to travel to purportedly unsafe areas; and the threat to the educational system posed by guns in schools, which in turn would lead to less productive citizens. *Id.* The Court rejected these arguments as basically expanding the commerce power to include many activities which *might* lead to violent crime and would subsume areas which traditionally are reserved to the states, such as family law or the educational process. *Id.* at ——— ———, 115 S.Ct. at 1631–1633, 131 L.Ed.2d at 640–641.

The Court concluded that the Gun–Free School Zones Act was outside the limits of the broad range of subjects which Congress may regulate under the Commerce Clause:

> ... The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States....

*Id.* at ———, 115 S.Ct. at 1634, 131 L.Ed.2d at 642–643. The statute therefore was held to be invalid and insupportable under the Commerce Clause. *Id.* at ———, 115 S.Ct. at 1634, 131 L.Ed.2d at 643.

## II. THIRD CIRCUIT PRECEDENT

As was to be expected, following the Supreme Court's decision in *Lopez*, defendants began to challenge federal statutes on the grounds that they exceeded Congress' authority under the Commerce Clause. *See United States v. Cardoza*, 914 F.Supp. 683, 684 (D.Mass.1996) (collecting cases). One of those cases is *United States v. Bishop*, 66 F.3d 569 (3d Cir.), *reh'g and reh'g en banc denied*, 73 F.3d 23 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 750, 133 L.Ed.2d 698 (1996).

At issue in *Bishop* was the federal carjacking statute, 18 U.S.C. § 2119. As in *Lopez*, the defense argued that Congress exceeded its authority in enacting the statute because carjacking is not interstate commerce, nor does it have a substantial impact on interstate commerce because it is peculiarly local in nature. In addressing the Commerce Clause argument, the Third Circuit began with an overview of *Lopez* which is consistent with that recited above. *Bishop* at 575–576.

The Third Circuit concluded that the carjacking statute was constitutional because: "(1) Congress had a rational basis for believing that carjacking substantially affects interstate commerce; and (2) section 2119 has, as an element of the offense, a requirement that there be a constitutionally adequate nexus with interstate commerce." *Id.* at 576.

Unlike the Gun–Free School Zones Act, considerable congressional fact-finding accompanied the carjacking statute. The fact-finding reflected: the seriousness of the problem of automobile theft; the profit to be derived therefrom; that it was being conducted as a business; that carjacking was one of the means by which car theft was accomplished; that carjacking was increasing because of its profitability; that local law enforcement was being overwhelmed by the problem; and that the problem was complex, nationwide in scope, and in need of being addressed through a national approach. *Id.* at 578–580.

In concluding that these factual findings provided a basis upon which Congress rationally might conclude that carjacking had a substantial impact on interstate commerce, the Third Circuit emphasized several considerations:

First, carjacking is both economically motivated and part of a greater economic activity. "When a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss. Replicated 15,000 or 20,000 time per year, the economic effects are indeed profound." *Id.* at 581.

Also, the carjacking statute was one aspect of a national approach to a national economic problem. Although each instance of auto theft is local by nature, Congress could rationally believe that the regulation of the local activity was necessary to solve the larger national (and international) problem of auto theft as a criminal business. *Id.* at 581.

In contrast to the dissent's view that "commerce" requires "a voluntary economic exchange," which carjacking clearly is not, the Third Circuit defined "commercial as including those activities which form a part of an economic enterprise." *Id.* at 581 (citing *Lopez*).

Next, the Third Circuit emphasized that a party contesting the factual basis for a congressional exercise of authority bears the burden of offering more than common sense intuitions contrary to Congress' findings, particularly when there is authoritative evidence to the contrary. *Id.* at 581–582. In the same context, Congress is not burdened by a high standard of proof, but may rely on general information concerning the issue addressed by the challenged statute. *Id.* at 582–583.

Congress also need not show in a particularized sense that the activity substantially burdens interstate commerce. That is, each instance of the regulated activity need not itself be a substantial burden to interstate commerce, so long as the aggregate effect of the activity is a substantial burden. *Id.* at 583–584.

Since the Constitution does not delegate to Congress generally the right to enact criminal laws,[1] every foray into the area of criminal law is an intrusion into the states' traditional dominion. However, when an activity is the source of a problem national in scope and substantially affects an area over which Congress has power, Congress is within its authority in determining that the balancing inherent in federalism weighs in favor of its regulating that activity. *Id.* at 584–585.

A factor weighing heavily in favor of passing constitutional muster is a jurisdictional element in the criminal statute, that is, one which requires as an element of proof evidence that the activity is interstate in nature. *Id.* at 585–588.

Having weighed all of these factors, the Third Circuit concluded that Congress had a

---

**1.** Specific exceptions are counterfeiting, U.S. Const. art. I, § 8, cl. 6, piracy and felonies at sea, U.S. *Const.* art. I, § 8, cl. 12, and treason, U.S. Const art. III, § 3, cl. 1. In cases of impeachment, bribery is grounds for removal from a federal office.

*U.S. Const.* art. 2, § 4. Otherwise, the crime must be defined as an exercise of an enumerated power, such as the power to "regulate Commerce ... among the several States, .." *U.S. Const..* art. I, § 8, cl. 3, as reviewed in Lopez.

rational basis for concluding that carjacking substantially affects interstate commerce. The Third Circuit also reviewed the carjacking statute as it related to the instrumentalities of interstate commerce, a separate category of regulation of commerce which we need not address. It should be noted, however, that the Third Circuit added the caveat that *Lopez* had not changed the law in that courts still must exercise great restraint before finding that Congress has overstepped its commerce power. *Bishop* at 590.

### III. DISTRICT COURT OPINION IN THE THIRD CIRCUIT

As noted, one other district court in the Third Circuit has reviewed the CSRA under the Commerce Clause. In *United States v. Parker*, 911 F.Supp. 830 (E.D.Pa.1995), the Honorable Louis Charles Bechtle held that Congress did not have a rational basis for finding that the willful failure to pay child support with respect to a child residing in another state substantially affects interstate commerce. The case currently is before the Third Circuit.

In *Parker*, the defendant was accused of not making a monthly payment of child support in the amount of $100.00 from the time that it was ordered in 1990. The exact amount of the arrearage was not determined.

Judge Bechtle first set forth a summary of the opinion in *Lopez*, including the history of Commerce Clause jurisprudence, which is consistent with that recited above. *Parker* at 832–834. In examining the specific statute in question, Judge Bechtle pointed out that both *Lopez* and *Bishop* require that the activity regulated must be commercial in nature, and restated the definition of "commercial" as "including those activities which form a part of an economic enterprise." *Parker* at 834 (quoting *Bishop* at 581).

In determining that the regulated activity does not have a substantial effect on interstate commerce, Judge Bechtle first pointed out the nature of child support as part of the divorce process. The obligation arises under state law pursuant to an order of court. Generally, the payment is made to the state, and the money forwarded to the custodial parent. *Id.* at 834–835.

In contrast, "commerce" as the term is used for purposes of review under the Commerce Clause is not implicated:

Arm's-length commercial actors are not involved in any way.

The marketplace for goods and services and prices of commodities are not affected at all. There are no affiliates or cohorts that comprise part of a greater economic network or enterprise. A citizen's ability to travel is not threatened. A willful failure to pay a court-ordered sum, without more, involves no other crimes. The activity at issue, therefore, has simply nothing to do with commerce in the context of the limited power of the federal government and withheld from the states in the Commerce Clause.

*Id.* at 835. Judge Bechtle rejected the notion relied upon by other courts, *see, e.g., Nichols* at 311–312; *Kegel* at 1238, that other links to interstate commerce, such as the use of the mails and wires or the travel of the non-custodial parent to another state, amount to a substantial effect on interstate commerce. *Parker* at 835. *See also Parker* at 842–843 (reviewing § 228 in the context of regulating the channels of interstate commerce).

Judge Bechtle next reviewed the facts found by Congress and found that they did not constitute a rational basis for finding that § 228 is acceptable under the Commerce Clause. *Id.* at 835–837. Basically, the problem with the facts found is that they establish the impact of the activity without determining that the activity affects commerce: the focus must be on the activity and whether it has a relationship to an economic enterprise. *Id.* at 837 (citing *Lopez* at —— ——, 115 S.Ct. at 1630–1631, 131 L.Ed.2d at 638).

Also rejected was the argument that the impact on interstate commerce was substantial because the idea that the failure to make child support payments deprives children of the basic necessities of life, so that custodial parents must resort to other means to support their children. Judge Bechtle analogized this argument to the "cost of crime"

and "national productivity" reasoning rejected in *Lopez*. *Parker* at 837–839.

Judge Bechtle next contrasted § 228 with other criminal provisions, including those reviewed in *Lopez* and *Bishop*. In addition, he compared § 228 to the statute reviewed in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), in which regulations enacted to control the volume of wheat were applied to an individual whose wheat was grown for home consumption. Because of the effect on competition, the regulation was valid under the Commerce Clause. *Parker* at 839 (quoting *Wickard* at 126–128, 63 S.Ct. at 90). In another case, the Supreme Court upheld criminal provisions outlawing extortionate credit transactions because of the relationship between loan-sharking and organized interstate crime. *Parker* at 840 (citing *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). Having reviewed these cases, Judge Bechtle found that the CSRA is most akin to the Gun–Free School Zones Act considered in *Lopez*. *Parker* at 839–842.

The government also argued that § 228 is valid as a regulation of a use of the channels of interstate commerce, the second category of regulation described in *Lopez*. Judge Bechtle rejected this notion for two reasons: First, such regulations are valid when they regulate goods or persons moving in interstate commerce, and unpaid child support is neither. Second, § 228 makes it a crime *not to use* the channels of interstate commerce by not making child support payments, as opposed to the *use* of such facilities. *Parker* at 842–843.

Because there is no nexus between the willful failure to pay child support and interstate commerce, Judge Bechtle also found no jurisdictional element to the statute. *Id.* at 843.

## IV.  DIFFERENCE WITH PARKER

■ As noted, this court concludes that the CSRA is valid under the Commerce Clause. Because this conclusion is contrary to the thorough opinion of the only other judge of this circuit to have considered the matter, we think it important to set forth the reasons for our opposite conclusion.

We note first that the Third Circuit's definition of "commerce" for purposes of review under the Commerce Clause is broad. The Third Circuit specifically rejected the dissent's notion that commerce is limited to voluntary transactions. *Bishop* at 581. *See also Bishop* at 591–592 (Becker, J., dissenting; "commercial transaction" refers to a voluntary economic exchange). The fact that the support payments are court-ordered, then, takes on lesser significance than is attributed to this characteristic in *Parker*.

The standard for this category of regulation under the Commerce Clause is that the regulated activity must substantially affect interstate commerce. The *Parker* opinion emphasizes the economic nature of the activity. Actually, carjacking is not an economic activity; it is only when the cars or their parts are disposed-of that the carjacker reaps a benefit, and only when the car is replaced by the owner or the insurer that there is a monetary loss.

■ In *Parker*, the court relied on *Lopez* for its emphasis on the economic nature of the activity. Actually, as *Bishop* shows, the activity itself need not be economic or commercial in nature, but its impact must be. The Supreme Court in *Lopez* did not restrict regulated activities to those which are commercial in nature, but found that mere possession of a gun in a school zone not only is not commercial in nature but has no significant impact, even in the aggregate, on interstate commerce. The reasoning in *Parker* is misplaced in that it purports to emphasize "activity" over "substantial," but actually emphasizes "activity" over "effect." The result of this reasoning is a conclusion that the Supreme Court rejected the Gun–Free School Zones Act because carrying a gun in a school is not an economic activity. Actually, the Court concluded that carrying a gun in a school not only is not an economic activity but has no impact on economic activity. It is for the latter reason that the statute was invalid.

The court in *Parker* also emphasized the fact that the withholding of child support payments is not part of a larger economic enterprise, as individual instances of carjack-

ing are related to the larger business of stealing automobiles or individual instances of extortion are part of the larger business of organized crime. Certainly an organized, business-like approach to an activity such as extortion or carjacking will have a greater impact on legitimate commerce.

However, nothing in *Bishop* or the Supreme Court cases cited requires that a larger enterprise exist. The fact of such a business is a measure of the potential impact of the activity in question and would be a rational basis for congressional action, but it is not outcome-determinative of the question of the substantial effect of the activity. In fact, the *Bishop* court specifically held that the carjacking statute was constitutional despite the lack of evidence that the appellants had been part of a larger organization. *Bishop* at 583–584. This reflects the fact that it is the aggregate effect of the activity, not the particular manner of carrying it out (i.e. as a business) that determines whether the activity has a substantial effect on interstate commerce.

The rationale for finding § 228 to be valid under the Commerce Clause is set forth in a number of the district court opinions cited above, and most extensively in *Nichols*. We therefore will not review that reasoning at length here. To summarize, however, we find:

>>Payment of child support is an economic activity because it is the payment of a debt owed by one person to another, regardless of how the debt came into existence.

>>While the activity of willfully failing to pay child support may have a relatively minor impact in a particular case, the aggregate effect of such activity is that billions of dollars goes uncollected annually.

>>That billions of dollars in child support goes unpaid annually is evidence both that the activity is economic in nature and that the effect of not paying child support is substantial.

>>The CSRA is one aspect of a national approach being taken with respect to a national problem which local efforts have been unsuccessful in resolving.

>>The CSRA does not violate the principles of comity and federalism because it does not displace any approach taken by the states. In fact, it furthers the approach taken by the states by furthering the enforcement of state court decrees. In addition, the CSRA goes no further than the enforcement of state court decrees and is not an attempt by Congress to legislate with respect to the amount of child support payments in any particular case; any ruling that support must be paid and the amount to be paid is left to the states.

>>The CSRA has a jurisdictional element in that the failure to pay must be with respect to a child residing in another state.

### V. CONCLUSION

Based on all of the foregoing, we conclude that the willful failure to pay child support with respect to a child residing in another state has a substantial effect on interstate commerce, and § 228 is valid under the Commerce Clause. Ganaposki's motion as it may be construed as a motion to dismiss will be denied.